796 A.2d 101

Steven Fritz FACON

v.

STATE of Maryland.

No. 1789, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Feb. 5, 2002.

Reconsideration Denied April 17, 2002.

4

6

8

Julia Doyle Bernhardt, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

M. Jennifer Landis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Jack Johnson, State's Attorney for Prince George's County of Upper Marlboro, on the brief), for appellee.

Submitted Before HOLLANDER, JAMES R. EYLER, and SONNER, JJ.

HOLLANDER, Judge.

A jury sitting in the Circuit Court for Prince George's County convicted Steven Fritz Facon, appellant, of two counts each of robbery with a dangerous weapon, first degree assault, and use of a handgun in the commission of a felony. After merging the assault convictions into the armed robbery convictions, the court sentenced appellant to two concurrent terms of twenty-five years' imprisonment, without parole, for each armed robbery conviction, and concurrent terms of twenty years, the first five years without parole, for each handgun conviction.

On appeal, Facon presents a host of issues, including whether a defendant commits an armed robbery if the taking of property occurs after the weapon has been put away. He also asks whether the facts support a single robbery or two robberies when, in the course of one episode, the robber forcibly takes one item of property in the possession of two employees of a single entity that owned the property. Put another way, that issue concerns the appropriate unit of prosecution.

Appellant's questions, which we have rephrased and reordered, are as follows:

I. Did the motion court err in denying appellant's motion to suppress his oral statement to the police?

II. Was the evidence sufficient to support appellant's convictions for: 1) armed robbery, when there was no evidence that appellant used force or intimidation in taking cigarettes; 2) two counts of armed robbery when there was only a single taking; 3) first degree assault against Ms. Barton–Smith, when appellant never pointed a handgun at her; and 4) first degree assault, armed robbery, and use of a handgun, when there was no evidence that appellant used a handgun?

III. Did the trial court err in permitting the State to impeach appellant with two prior convictions for armed robbery?

IV. Did the trial court err in overruling appellant's objection to the State's closing argument?

V. Did the trial court err in imposing a sentence of twenty-five years without parole for each armed robbery conviction, pursuant to Md.Code Ann., Art. 27, § 643B(c)?

For the reasons discussed below, we shall affirm appellant's convictions, but vacate one of the two armed robbery sentences.

## FACTUAL SUMMARY

### A. TRIAL

During the early morning hours of August 22, 1999, Gadissa Terfa and Audrea Barton–Smith were working at the 7–Eleven store located at 2000 East–West Highway in Hyattsville. At around 1:15 a.m., Terfa was standing directly behind the sales counter next to the cash register, while Barton–Smith was in the back of the store. At that time, a man, later identified as appellant, walked into the store, asked Terfa for the price of a bag of chips, and put the bag on the counter. Suddenly, the man pulled up his shirt and displayed a small black and silver handgun. The assailant then demanded that Terfa "open the register." When Terfa was unable to do so, because he was too nervous, the assailant pulled out a gun and pointed it at Terfa.

According to Terfa, the assailant also pointed his handgun at Barton–Smith, who had emerged from the back of the store, and ordered her to open the cash register. She, too, was unable to do so. Appellant then put away the gun, grabbed a pack of cigarettes, and exited the store without paying for the cigarettes. He left the bag of chips behind. Terfa did not stop appellant from taking the cigarettes because appellant "had a gun."

Upon exiting the store, Terfa saw appellant enter a black car with a District of Columbia license plate. Terfa recorded the car's tag number, AM 1398, and gave the information to

the police. At trial, Terfa could not identify appellant as the robber, but he identified a gun that had been recovered from the vehicle at the scene, indicating that it matched the one used by the robber.

Barton–Smith testified that she was in the back of the store and approached the counter in front when she heard the cash register making noise. At the time, she thought her co-clerk was having a problem with the register. She then "saw the customer pointing a gun and telling Gadissa to open the register." She added that the assailant "was leaning on the counter with the muzzle of the gun pointing toward us." Barton–Smith claimed that the man said to both of them: "Open the register or I'll blow your heads off." [1] She identified appellant at trial as the assailant.

Officer Bernard Barnes responded to the scene following the incident. He testified that Terfa gave him a piece of paper bearing District of Columbia license tag number AM 1398. That car was linked to appellant by the testimony of Stephanie Young, appellant's girlfriend of 16 years and the mother of his son.

Ms. Young testified that she and appellant were co-owners of a burgundy Mazda 626, although appellant was the primary driver of the car. She said that the vehicle was registered in D.C. and had a license tag number of AM 1398. According to Ms. Young, appellant told her in late August 1999 to sell the car because he was no longer employed and could not afford the car payments. Accordingly, she arranged to sell the vehicle to her cousin, John Wallace. In the process of doing so, she found a small handgun in the center console of the car. She claimed that she had never seen appellant with a gun. Wallace confirmed that a loaded gun was in the Mazda and the police took custody of the car.

---

1. The prosecutor continued to probe about the direction that the gun was pointed. Barton–Smith said: "He pointed it toward us . . . ." Then, when asked again if the assailant ever "point[ed] it anywhere else besides at Gadissa," she responded "no."

Corporal Scott McVeigh, an evidence technician with the Prince George's County Police, testified that a loaded .38 pistol was recovered from the center console of the vehicle. Further, the bag of chips that appellant left in the store was processed for fingerprints. Expert testimony from Elores Clark revealed that fingerprints recovered from the bag matched those of appellant. In addition, the incident was captured on videotape by the store's video-recording equipment.

Detective Michael Olds testified as to his interview of appellant and Facon's waiver of rights. He told the jury that Facon gave an oral statement to police, admitting that he robbed the 7–Eleven on August 22, 1999. Facon claimed that he had smoked a lot of cocaine that day and had also consumed alcohol, but the "motivation for doing the robbery was not to get money for narcotics." Rather, he needed money to buy gasoline for his car.

Appellant was one of the defense witnesses. He admitted that he went to the 7–Eleven store on the date in question, "with the intent to rob" the store. At the time, he was "high" on crack cocaine and "drunk" from malt liquor, and needed money "to get some . . . drugs." He denied using a handgun, claiming instead that he used a paint gun and pretended that it was a real gun. He also denied pointing the paint gun at either clerk, but acknowledged that he put the paint gun on the counter. Although Facon was a cigarette smoker, he denied any intent to take the cigarettes, and testified that he did not even remember taking the cigarettes "until I seen the film in court." Further, he testified that he did not know how the handgun got in his car, and maintained that the gun was not his. On cross-examination, appellant admitted that he pleaded guilty to armed robbery in both 1995 and 1989.

## B. PRE–TRIAL SUPPRESSION HEARING

The court held a two-day motion hearing prior to trial, involving several issues in two cases. We shall include here only the evidence relevant to the motion to suppress appellant's oral statement to the police, made on September 2, 1999.

After appellant's car was tied to the incident at the 7–Eleven, a warrant was issued for his arrest. Facon was arrested on the evening of August 31, 1999, in the District of Columbia. The next day, appellant waived extradition to Prince George's County, and he was transported to Central Processing on the evening of September 1, 1999, about 24 hours after his arrest.

At about 10:00 p.m. on September 1, 1999, Corporal Michael Olds and Detective John Craig of the Prince George's County Police Department placed appellant in an interview room, which measured approximately twelve feet by eight feet. Both officers maintained that, throughout the interview, Facon was coherent, alert, physically fine, and appeared to understand what was said to him. Moreover, he never requested an attorney. At appellant's request, the officers did not close the door whenever they left the interview room. But, when appellant was left alone, his hand was cuffed to a ring attached to the wall. As Corporal Olds recalled, appellant never complained that the handcuff was too tight.

Corporal Olds testified that, at the outset, he asked appellant if he wanted coffee. Appellant replied that he did, and was given coffee at 10:08 p.m. At about the same time, appellant asked to make a telephone call, but Corporal Olds responded, "in a little while." In fact, appellant was not permitted to make a phone call until after 9:00 a.m. the next day.

Initially, Detective Craig spoke with appellant alone, from 10:30 p.m. until 11:55 p.m. During the early portion of that segment, Detective Craig gave Facon some cigarettes and discussed general matters, such as appellant's drug problem, his prior arrests, and the recent death of appellant's nephew. They did not talk about the robbery at that point. Moreover, while Detective Craig was speaking with Facon, he did not wear a weapon, nor was Facon handcuffed.

Detective Craig testified that he asked appellant if he knew why he was arrested, and appellant indicated that he was arrested on a robbery warrant. In response, Detective Craig

told appellant his car had been used in a robbery. At that point, the detective pulled out a waiver of rights form, but Facon said he did not "want to sign anything right now." Detective Craig responded by saying "that's fine," and he put the waiver form away. According to the detective, he then asked Facon, "do you want to discuss this at all right now. [Facon] said, I'll discuss it but I don't want to write anything, I don't want to make a statement." The detective further testified that the two then "started talking about [Facon's] drug problem, getting high, he had apparently been in a drug program in prison the first time and how the program had worked for him. That's basically it."

At about 11:55 p.m., Detective Craig left the interview room to get more coffee for appellant. Facon declined an opportunity to use the bathroom. Craig returned at 12:22 a.m. (September 2, 1999), and they resumed talking about appellant's family, his drug problem, and the robbery warrant. Detective Craig claimed that Facon "went into great length as to how he thought he needed to get into a drug program. I told him I can't get you into a drug program, that's not my call."

At approximately 2:55 a.m., Detective Craig left the interview room, and returned again at about 3:20 a.m. At that time, both detectives escorted appellant to the bathroom. Detective Craig and appellant then entered the interview room at 3:25 a.m., and again discussed "the same thing [they] had been talking about all night, which was [appellant's] family ... he had been using crack, using drugs...." At that point, they began "getting into the incident a little bit." Facon recounted that he was at a crack house and, when he came out, he found that "his car had been stolen." At 4:25 a.m., Craig left the interview room, and he did not see Facon again until after Facon had given a statement to Olds.

At about 4:40 a.m., Corporal Olds entered the interview room, at Detective Craig's request, so that Facon "could see a new face, talk to somebody else." Olds remained there until 5:55 a.m. Appellant was briefly removed from the interview

room at 6:10 a.m. for photographing, and he was then returned to the room. At 6:35 a.m., Olds entered the room and gave appellant coffee, water, and cigarettes. The officer claimed they were "done" talking about Facon's family, and began to review the evidence against Facon. Olds acknowledged that Facon "was getting tired," but claimed that appellant then began "to ask about what does the statement entail." Olds replied, "a statement is a statement." When Facon answered that he did not want to write anything or sign anything, Olds testified that he "said, well you have to sign a waiver form or we don't get into the statement. And he agreed to do that." At 7:08 a.m., appellant agreed to waive his rights and make a statement. Accordingly, Olds left the room at 7:13 a.m. to obtain a waiver form. When Corporal Olds returned with the form, he began the waiver process. Facon's statement was completed by 7:45 a.m.

With respect to the waiver form, Corporal Olds recalled that he read appellant the Advice of Rights form, and Facon seemed to understand. At the time, Olds was not wearing a weapon, nor was Facon handcuffed. Appellant signed the form at about 7:14 a.m. on September 2, 1999; he placed his initials next to each right, and put check marks indicating that he understood the particular rights and wanted to make a statement.

Upon signing the waiver form, appellant began to cry. Corporal Olds told appellant that, by signing the waiver, it was not an admission of anything. Rather, it was just an indication that he had cooperated with the police. At Facon's request, Corporal Olds did not take notes while Facon made his statement. According to Olds, appellant confessed to robbing the 7–Eleven store, claiming that he was high on narcotics at that time. After the interview, Corporal Olds wrote down as much as he could remember of appellant's oral statement.

In sum, Corporal Olds claimed that he spent a total of two to three hours with appellant. Apart from the delay as to the phone call, Olds asserted that Facon was "treated extremely

well." Moreover, Corporal Olds never saw appellant sleeping, nor did appellant indicate that he was tired or wanted to rest.

In his discussions with Facon, Corporal Olds said he told appellant that he was "making no promises" about a drug treatment program, but said he "would absolutely relay that [appellant] has a bad narcotic habit to the state attorney [sic] ... and that was about the best I could do." The following testimony on direct examination is also relevant:

[PROSECUTOR]: Okay. So you told him that you would communicate that information to the State's Attorney Office?

[CORPORAL OLDS]: Correct.

[PROSECUTOR]: And other then [sic] that did you make him any other promises or anything else to him?

[CORPORAL OLDS]: No.

On cross-examination, Corporal Olds acknowledged that he told appellant that if Facon was "not responsible for any other robberies," Olds would "make a recommendation to the State." On re-direct, the officer explained that he told Facon he "would advise the State that according to [Facon], that he had a serious narcotic problem." The officer further testified about the last portion of his "waiver notes," which state: "I'll make a recommendation to the State. Advised I could not make any promises and I asked was he clear on that and he agrees and initials." Referring to the content of the notes, the prosecutor then asked: "And did you say that to him?" Olds replied, "Yes. Absolutely."

At 9:00 a.m., Detective Craig brought appellant a sandwich. Shortly thereafter, appellant was allowed to make a telephone call. Appellant was also taken to the bathroom and provided with more cigarettes. At about 10:30 a.m., appellant was brought before a commissioner. Corporal Olds conceded that appellant had been held about twenty-four hours in D.C. before arriving in Maryland, and Facon was not taken to a commissioner until approximately twelve hours after his arrival in Maryland.

Both officers were questioned thoroughly about their interrogation of Facon, and both testified that while appellant was in their custody he never asked for an attorney, nor did he indicate that he did not want to speak with them. Moreover, the detectives claimed that appellant remained alert and coherent, did not ask for an opportunity to rest or sleep, nor did they ever see appellant fall asleep. Indeed, Detective Craig believed that appellant "was up the whole time...." Facon was also provided with food, drinks, cigarettes, and bathroom opportunities. Moreover, both officers denied making any promises, threats, or offers to induce Facon to make a statement. Generally, only one officer was in the interview room at any one time, and neither officer wore his weapon while in the room.

At the suppression hearing, appellant recalled his arrest in Washington, D.C. on August 31, 1999, and said he was held there one night. On September 1, 1999, he was awakened at 5:30 a.m. for breakfast, and had been awake since that time when the interrogation began on the night of September 1, 1999. When the interview began, Facon said he had no idea why he had been arrested, and asked the detectives "why am I here." Although appellant could not recall the details of his early conversation with Detective Craig, he remembered that he told Detective Craig that he "wanted to see a lawyer, that I didn't want to give no statement, no written statement at that time." He could not recall the amount of time that elapsed before he requested an attorney.

According to Facon, Corporal Olds repeatedly tried to get him to write a statement. Although appellant "told him I am not writing a statement," he claimed Corporal Olds ignored what appellant said. Appellant maintained that, prior to signing the waiver form, Officer Olds "promised" him that he would "recommend I get some help in the drug program...." Yet appellant acknowledged that Olds's remarks were "a whole lot of stuff I heard before ... because I know he can't, wasn't willing, so he promised that he would talk to the state to recommend I go to a drug program...."

Facon, who testified that he went to college, said he had no difficulty understanding English and understood his rights when he signed the waiver form. Appellant also acknowledged that he checked the box on the waiver form indicating that he had not been promised anything. He explained that, by then, he had been interviewed for eight or nine hours, merely because he had refused to give a statement; had he given a statement, the interview would have ended. Moreover, he was "tired," wanted to talk to a lawyer, was handcuffed, and claimed that "this was my only way out, my signing this [waiver form]." He denied that he made the comments reflected on Detective Olds's notes, and claimed he did not tell Detective Olds not to take notes. Moreover, despite signing the waiver, appellant testified: "I never made a statement."

Thereafter, the court denied the motion to suppress. In its ruling, the court recognized that the matter "centers" on the credibility of the two detectives and appellant. The court found that appellant was handcuffed for a portion of the time that he was in the interview room, and that he also "indicated he wanted to get into a drug program...." Moreover, the court noted that "it is undisputed that Detective Olds ... said that he would tell the State's Attorney that the defendant had a drug habit." But, the court found that the statement by Olds that he would "tell the State's Attorney's Office [Facon] had a drug problem is not the promise direct or indirect that is referenced ... in the *Hillard* case." As to Facon's alleged request for an attorney, the court expressly credited the testimony of the police.

From these factual conclusions, the court was satisfied that appellant "knowingly and voluntarily and intelligently" gave a statement to police. At the same time, the court acknowledged that, ultimately, the issue of the voluntariness of the statement would be a question for the jury to resolve.[2]

We shall include additional facts in our discussion.

---

2. At trial, the witnesses were thoroughly questioned about the circumstances of the interrogation and statement. Moreover, in its instruc-

## DISCUSSION

### I.

Appellant contends that the court erred; in denying his motion to suppress the custodial oral statement. He argues that, under the totality of the circumstances, the statement was not made voluntarily. Facon makes no claim that the police failed to comply with the dictates of *Miranda.* Instead, he points to improper police "tactics," including the length and circumstances of the interrogation, which was conducted throughout the night and without giving Facon any opportunity to sleep; the delay in his presentment to a commissioner; the "tag-team" approach of the two detectives; and his reliance on inducements by Corporal Olds, including that Olds would recommend to the State's Attorney that appellant receive drug treatment. Facon adds that it is clear that, at the time of the interrogation, he was distraught. Further, he claims he was induced because the police told him it would be helpful to him if he cooperated and waived his rights; a waiver is not an admission; and, "in return for the waiver and oral statement," Corporal Olds promised to talk to the State's Attorney about "getting [appellant] help for his drug problem." Facon also asserts that, in reliance on these inducements, he "[i]mmediately executed the waiver of rights and gave his statement."

When reviewing the denial of a motion to suppress, the record at the suppression hearing is the exclusive source of facts for our review. *Lee v. State,* 311 Md. 642, 648, 537 A.2d 235 (1988); *Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994), *cert. denied,* 337 Md. 89, 651 A.2d 854 (1995). We extend great deference to the fact finding of the suppression judge and accept the facts as found, unless clearly

---

tions to the jury, the court advised the jury, *inter alia,* that if the jury found that the statement had been made, it could not consider the statement unless it was satisfied, beyond a reasonable doubt, that the State had proved the statement was made voluntarily. In addition, the court instructed the jury as to the meaning of "voluntary" and the factors to consider in determining voluntariness.

erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). In addition, we review the evidence in the light most favorable to the State as the prevailing party. *Riddick,* 319 Md. at 183, 571 A.2d 1239.

An issue as to the voluntariness of a statement is a mixed question of law and fact. *Baynor v. State,* 355 Md. 726, 729 n. 1, 736 A.2d 325 (1999); *Hof v. State,* 337 Md. 581, 605, 655 A.2d 370 (1995). Therefore, we conduct a *de novo* review of the trial court's resolution of the voluntariness issue, based on the record from the suppression hearing. *Winder v. State,* 362 Md. 275, 310–11, 765 A.2d 97 (2001); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000). After giving due regard to the suppression court's findings of fact, we make our own independent, constitutional appraisal by reviewing the law and applying it to the facts of the case. *McMillian v. State,* 325 Md. 272, 281–282, 600 A.2d 430 (1992).

When, as here, the prosecution seeks to introduce an admission given by a defendant while in custody, the State must, upon proper challenge, establish by a preponderance of the evidence that the statement was obtained in conformance with the dictates of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Hoey v. State,* 311 Md. 473, 480, 536 A.2d 622 (1988). The State also bears the burden of establishing that the incriminating statement was made voluntarily, under Maryland nonconstitutional law, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article 22 of the Maryland Declaration of Rights. *See Ball v. State,* 347 Md. 156, 173–74, 699 A.2d 1170 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998); *Hof,* 337 Md. at 597–98, 655 A.2d 370; *Hoey,* 311 Md. at 480, 536 A.2d 622.

Under Maryland nonconstitutional law, a custodial statement is inadmissible unless it is "shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." *Hillard v. State,* 286 Md. 145, 150, 406 A.2d 415 (1979). Coercion may be

physical or psychological. *See State v. Kidd,* 281 Md. 32, 36, 375 A.2d 1105 (1977). A confession is voluntary if it is "freely and voluntarily made at a time when [the defendant] knew and understood what he was saying.'" *Hoey,* 311 Md. at 481, 536 A.2d 622 (citation omitted). Conversely, "a confession is involuntary if it is induced by force, undue influence, improper means, or threats." *Id.* at 483, 536 A.2d 622.

 Moreover, the voluntariness of a statement depends on "the totality of all the attendant circumstances." *Burch v. State,* 346 Md. 253, 266, 696 A.2d 443, *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997); *see Winder,* 362 Md. at 307, 765 A.2d 97; *Marr v. State,* 134 Md.App. 152, 164, 759 A.2d 327 (2000). The totality analysis encompasses several factors, including the defendant's age and education; the defendant's physical condition and mental capacity; the length and location of the interrogation; the persons present at the interrogation; the use of physical or psychological intimidation or mistreatment of the suspect; whether the defendant was given *Miranda* warnings; and the use of force, undue influence, or improper promises by the police to induce the statement. *Hof,* 337 Md. at 596–97, 655 A.2d 370; *West v. State,* 124 Md.App. 147, 157, 720 A.2d 1253 (1998), *cert. denied,* 353 Md. 270, 725 A.2d 1068 (1999). "Generally, no one factor is dispositive." *Reynolds v. State,* 327 Md. 494, 503, 610 A.2d 782 (1992), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993).

In determining whether a confession is voluntary under the federal Constitution and the Maryland Declaration of Rights, *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), provides guidance. There, the Supreme Court held that "coercive police activity" is a necessary element to finding a confession involuntary. *Id.* at 167, 107 S.Ct. 515. The Court stated that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164, 107 S.Ct. 515 (footnote omitted). Moreover, the Court reasoned that a contrary rule would

require "sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State." *Id.* at 167, 107 S.Ct. 515.

With regard to the claim of improper inducement, Facon focuses primarily on Olds's representation that he would inform the State's Attorney that appellant had a serious narcotic habit and needed drug treatment. He also suggests that the police led him to believe a statement would be helpful, because it would show his cooperation.

In *Winder v. State,* 362 Md. 275, 305, 765 A.2d 97 (2001), the Court said:

> While we permit the police to make appeals to the inner conscience of a suspect and use some amount of deception in an effort to obtain a suspect's confession ... when the police cross over the line and coerce confession by using improper threats, promises, inducements, or psychological pressures, they risk loss of the fruits of their efforts.

The defendant in *Winder* had been sentenced to death following convictions on three counts of first degree murder. One issue on appeal concerned the defendant's claim that his confession was involuntary because it was obtained at the end of a twelve-hour interrogation conducted by four members of the State police, and "was the product of improper threats and promises made by the police...." *Id.* at 306, 765 A.2d 97. The Court agreed. *Id.*

In analyzing the defendant's contentions in *Winder,* the Court "gleaned" a two-part test from *Hillard* as to inducement. *Id.* at 309, 765 A.2d 97. The Court stated that a confession is involuntary, and thus inadmissible, if:

> 1) a police officer ... promises or implies to a suspect that he or she will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and

2) the suspect makes a confession in apparent reliance on the police officer's statement.

*Id.*

The first prong of the *Hillard* test is an objective one. *Id.* at 311, 765 A.2d 97. It requires a determination of whether the police made a threat, promise, or inducement. *Id.* But, "a suspect's subjective belief that he or she will be advantaged ... by confessing will not render the confession involuntary...." *Id.* Moreover, "[a] mere exhortation to tell the truth is not enough to make a statement involuntary." *Reynolds,* 327 Md. at 507, 610 A.2d 782. Similarly, in *Ball,* 347 Md. at 176, 699 A.2d 1170, the officer's statement to the suspect, to the effect that it would be helpful if he told the story, did not render the incriminating statement involuntary.

As to the second prong, the *Winder* Court observed that, without reliance on the interrogator's comments, there is no inducement. *Winder,* 362 Md. at 309–10, 765 A.2d 97. Thus, the Court explained that the "second prong of the *Hillard* test triggers a causation analysis to determine whether there was a nexus between the promise or inducement and the accused's confession." *Id.* at 311, 765 A.2d 97.

Applying that test to the facts and circumstances before it, the Court concluded that the defendant's confession in *Winder* had been improperly induced by the police. The improper inducements consume several pages of text in the Court's opinion, and include the following statement by the police, among many:

We're not interested in sending you to jail for the rest of your life.... We think the person who committed these [three murders] needs help. I think you need help. The only way we can get you that help is for you to let us know what happened. We can let the State's Attorney's office know hey, Eugene's told us what happened, but I think Eugene needs some help.

*Winder,* 362 Md. at 287, 765 A.2d 97. Clearly, the statements of the police in *Winder,* both in quality and quantity, do not resemble the alleged inducements here.

*Hillard,* 286 Md. at 153, 406 A.2d 415, on which the *Winder* Court relied, is also instructive as to the issue of improper inducement. Hillard claimed that a detective induced him to make an incriminating statement by promising that he would be "cut loose" if his statement was corroborated. The police officer in *Hillard* said to the defendant:

[I]f you are telling me the truth about your involvement in the occurrence, I will go to bat for you to the extent that I will tell the State's Attorney's office and the Court, number one, that you have cooperated, number two, you have told me the truth, and number three, I believe you were not knowledgeable as far as the murder was concerned.

The Court of Appeals reversed Hillard's conviction, finding that the police offered to intercede with the court and prosecutor in *exchange for* the defendant's confession. It also concluded that the State failed to establish that Hillard's admissions were not the product of improper promises made by the police.

We are also guided by *Boyer v. State,* 102 Md.App. 648, 651 A.2d 403 (1995). There, the police officer acknowledged that he told the defendant that, "after we are given a statement ... we talk with the State's Attorney just to let them know what we have done, touch base with them and see how they feel about an upcoming case." This Court upheld the denial of Boyer's suppression motion, finding that the police officer's remark did not constitute an improper inducement. The Court said:

Officer Mills ... did not say that appellant would receive a lesser penalty if he talked, and he did not represent that it would be easier on him if he confessed. He denied telling appellant that he would help him, or that he would get him a better deal with the State's Attorney if he talked. What Officer Mills did indicate to appellant was that he would inform the prosecutor that appellant had given a statement and was cooperative. Assuming that appellant concluded that the State would be favorably impressed upon receiving such advice, which is a perfectly reasonable assumption,

that conversation does not rise to the level of an improper inducement that would invalidate his confession.

*Id.* at 653–54, 651 A.2d 403.

■ In our view, this case is similar to *Boyer*, 102 Md.App. 648, 651 A.2d 403, and *Ball*, 347 Md. 156, 699 A.2d 1170; the statements do not constitute improper inducements. Even if Corporal Olds volunteered to tell the State's Attorney that Facon had a serious drug habit, the remarks, when isolated, are somewhat out of context. Facon disclosed his chronic drug problem, which explains the detective's statement that he would "relay" that information to the State's Attorney. Moreover, Olds was unequivocal in his testimony that he told Facon he could not make any promises about drug treatment, and appellant indicated that he understood. Nor did Facon assert at the suppression hearing that he did not understand. Indeed, he said just the opposite. Further, even if Olds told Facon that signing the waiver was not an admission, he was correct.

Facon also failed to satisfy the second prong of *Winder*, because the evidence did not show that appellant relied on the alleged inducements in making his statement. In other words, the officers' remarks did not cause appellant to give his statement.

Although appellant asserts in his brief that he made his statement "immediately" after the improper inducements, he overlooks his testimony at the suppression hearing, in which Facon expressly denied that he ever made any statement at all. If he made no statement, then the statement could not have been the product of improper inducement. Further, appellant has not referred us to any portion of his testimony in which he claimed, directly or indirectly, that he relied on promises made by the officers, and our review of the testimony suggests otherwise. Indeed, Facon testified, with apparent skepticism, about Olds's statement that he would recommend drug treatment. Yet Facon did not mention the other alleged inducements, such as the statement by Olds to the effect that signing the waiver would be construed as cooperation.

Rather, Facon explained his decision to sign the waiver by stating that he did so because he wanted to terminate what had been a lengthy interrogation, and the officers would not quit until he signed it. As he put it, he was in "a no win situation," and "the only way ... to get out of there" was if he agreed to sign the waiver. Signing the waiver and giving a statement are not one and the same. It is also noteworthy that Facon conceded that he understood the waiver form, which stated that no promises had been made to him in exchange for his statement. *Compare Stokes v. State,* 289 Md. 155, 159–60, 423 A.2d 552 (1980) (concluding that defendant relied on a promise of help by the police because, after hearing the promise, he immediately revealed the location of the narcotics); *Ralph v. State,* 226 Md. 480, 174 A.2d 163 (1961) (concluding that defendant did not rely on inducement because eight hours elapsed between inducement and incriminating statement).

Our lengthy recitation of the facts adduced at the suppression hearing also demonstrates that the motion court was presented with conflicting testimony from the police and the defense as to critical matters relevant to the issue of voluntariness, such as invocation of the right to counsel. "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact-finder." *Bayne v. State,* 98 Md.App. 149, 155, 632 A.2d 476 (1993); *accord Marr v. State, supra,* 134 Md.App. at 178, 759 A.2d 327; *Hall v. State,* 119 Md.App. 377, 393, 705 A.2d 50 (1998); *Hunter v. State,* 110 Md.App. 144, 163, 676 A.2d 968 (1996). The fact-finder is free to accept or reject parts of a witness's testimony. *Bayne,* 98 Md.App. at 155, 632 A.2d 476. Here, the court largely credited the testimony of the detectives as to what transpired during the interrogation, as it was entitled to do.

Appellant also complains about the duration of the interrogation and the time when it was conducted. To be sure, the interview was lengthy and was conducted throughout the night. But those factors are not necessarily dispositive as

to voluntariness. Indeed, we have recognized that the "sheer passage of time with repeated questioning . . . is essential to the majority of [police] interviews." *West,* 124 Md.App. at 158–159, 720 A.2d 1253.

*Young v. State,* 68 Md.App. 121, 510 A.2d 599 (1986), a case on which appellant relies, is factually distinguishable. There, the police interrogated the defendant "almost continuously" for twenty-two and one-half hours by means of a relay team of six officers. *Id.* at 132, 510 A.2d 599. Further, the police delayed the defendant's presentment, although a judicial officer was available. Then, after the presentment, the police ignored an order of the commissioner to take Young to a detention center. Instead, they resumed questioning, and at that point Young confessed. *Id.* at 126–27, 510 A.2d 599. We held the confession involuntary, based on the length and method of the interrogation, coupled with police misconduct. *Id.* at 135, 510 A.2d 599. Unlike in *Young,* appellant was questioned for eight or nine hours, only two detectives were involved, and the police did not ignore a court order.

*Marr,* 134 Md.App. at 165, 759 A.2d 327, is instructive. There, the defendant was held for over thirty-five hours and, in that time, he was questioned for a total of fourteen hours. Nevertheless, we were satisfied that Marr's confession was not involuntary. As in this case, the defendant there was provided with food, drink, and cigars, was allowed to use the bathroom, and was not in any apparent discomfort. Thus, we said: "The tactics were not overbearing. . . ." *Id.*

 Appellant also challenges voluntariness because the police officers did not take him before a commissioner until twelve and a half hours after his extradition to Maryland, and some thirty-six hours after his arrest in Washington, D.C. That fact alone is not controlling as to voluntariness. *See Woods v. State,* 315 Md. 591, 613–14, 556 A.2d 236 (1989).

In 1981, when the legislature enacted Maryland Code (1998 Repl.Vol., 2000 Supp.), Courts & Jud. Proc. Art. ("C.J."), § 10–912, it abrogated the *"per se"* exclusionary rule in

connection with a delay in the presentment of an accused to a judicial officer. C.J. § 10–912 provides:

**Failure to take defendant before judicial officer after arrest.**

(a) *Confession not rendered inadmissible.*—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

(b) *Effect of failure to comply strictly with Title 4 of the Maryland Rules.*—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

Maryland Rule 4–212(e) is also relevant. It states, in pertinent part:

The defendant shall be taken before a judicial officer of the District Court [upon arrest] *without unnecessary delay and in no event later than 24 hours after arrest* [.]

(Emphasis added).

Appellant has not referred us to any case indicating, for purposes of C.J. § 10–912 and Rule 4–212(e), that the officers were required to have considered the time that appellant was held in Washington, D.C., in calculating when they had to bring him before a judicial officer. Even assuming that the time that appellant spent in jail in Washington, D.C. counts toward calculating a delay in presentment, the delay of thirty-six and a half hours is not *per se* unreasonable.

In *Bey v. State*, 140 Md.App. 607, 616, 781 A.2d 952 (2001), we concluded that a delay of twenty-one hours between arrest and presentment to a commissioner was only one factor in deciding voluntariness and admissibility of confession. Writing for the Court, Judge Davis explained: "[T]he fact that the police did not immediately bring appellant before a commissioner because they wanted to question him, does not automatically lead to exclusion. Rather, we look to the totality of the

circumstances to determine if the confession was voluntarily given." *Id.* at 622, 781 A.2d 952. *See also Marr,* 134 Md.App. at 165–66, 759 A.2d 327 (delay of almost thirty-six hours between arrest and presentment to commissioner does not necessarily render confession involuntary; confession held admissible).

Under the circumstances presented, we find no error in the suppression court's ruling.

## II.

Appellant advances four arguments to support his claim that the evidence was insufficient to support his convictions, which we summarize: 1) Appellant was unable to steal money from the cash register, and the taking of a pack of cigarettes was not a robbery, because by that time the gun had been put away. Consequently, there was no evidence that Facon used force or intimidation to take the cigarettes. 2) Even if there was a robbery, Facon should have been convicted of only one robbery offense, rather than two, because there was only one taking of an item of property, because it belonged to a single business entity. 3) There was insufficient evidence to sustain the armed robbery or first degree assault convictions as to Barton–Smith, because Facon never pointed a gun at her. 4) There was no evidence that a handgun was used, and therefore the evidence was insufficient to sustain Facon's convictions for first degree assault, armed robbery, and use of a handgun in the commission of a felony.

Before we discuss each contention, in turn, we shall set forth the standard of review as to a sufficiency claim. Evidence is sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(emphasis in original); *see Briggs v. State,* 348 Md. 470, 475, 704 A.2d 904 (1998); *Dawson v. State,* 329 Md. 275, 281, 619 A.2d 111 (1993). In this posture, the limited question before us "is not

whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Fraidin v. State*, 85 Md.App. 231, 241, 583 A.2d 1065, *cert. denied*, 322 Md. 614, 589 A.2d 57 (1991)(emphasis in original). Moreover, it is not the function of an appellate court to determine the credibility of witnesses or the weight of the evidence. *Jones v. State*, 343 Md. 448, 465, 682 A.2d 248 (1996). Rather, it is the fact-finder's task to resolve conflicts in the evidence and assess the credibility of witnesses. *State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336 (1994).

### A. A Taking by Force

Appellant observes that the effort to rob the cash register was unsuccessful and, under the facts of this case, the taking of the cigarettes did not amount to a robbery. Although Facon acknowledges that "the cigarettes were taken from the presence of the employees," he contends that it was not a robbery because "no force or intimidation" was used "to accomplish that taking," as the weapon had already been put away. Therefore, he claims that his armed robbery convictions must be reversed. Facon asserts:

It was undisputed that [he] attempted to rob the store of money from the cash register and that he failed in this attempt. Thus, unless the taking of a package of cigarettes on the way out of the store, when the attempted robbery had ended, and no force or intimidation was being employed, constituted a robbery, the evidence was insufficient to prove robbery with a deadly weapon and use of a handgun in the commission of that felony.

In our view, Facon's claim lacks merit. We explain.

At the time of the underlying incident, robbery was a common law crime in Maryland; the statute, Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 486, only set forth the sanctions upon conviction. *See Borchardt v. State*, 367 Md. 91, 145 n. 9, 786 A.2d 631 (2001). Effective October 1, 2000, however, the General Assembly enacted a statutory robbery

offense, found in Article 27, § 486 of the Maryland Code. *See* 2000 Md. Laws, ch. 288.[3]

The common law definition of robbery is well settled. Under Maryland law, "[r]obbery is 'the felonious taking and carrying away of the personal property of another from his person by the use of violence or putting in fear.' " *Metheny v. State,* 359 Md. 576, 605, 755 A.2d 1088 (2000) (quoting *Williams v. State,* 302 Md. 787, 792, 490 A.2d 1277 (1985)). Robbery with a dangerous or deadly weapon is the offense of common law robbery, aggravated by the use of a "dangerous or deadly weapon." *Couplin v. State,* 37 Md.App. 567, 582, 378 A.2d 197 (1977), *cert. denied,* 281 Md. 735 (1978). *See Bowman v. State,* 314 Md. 725, 730, 552 A.2d 1303 (1989); Md. Code, Art. 27, § 487(a).

 Robbery is a specific intent crime. *State v. Gover,* 267 Md. 602, 606, 298 A.2d 378 (1973). Absent a larcenous intent, a robbery cannot occur. *Hook v. State,* 315 Md. 25, 30–31, 553 A.2d 233 (1989). The offense of robbery is distinguished from theft, however, by "the use of force or threat of force to overcome resistance." *Thomas v. State,* 128 Md.App. 274, 300, 737 A.2d 622, *cert. denied,* 357 Md. 192, 742 A.2d 521 (1999). As the Court explained in *Ball v. State,* 347 Md. 156, 188, 699 A.2d 1170 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998), when "the use of force enables the accused to retain possession of the property in the face of immediate resistance from the victim, then the taking is properly considered a robbery."

 The element of violence may be satisfied either by actual physical force or constructive force, which is also referred to as intimidation or putting the victim in fear. *See Thomas,* 128 Md.App. at 298–301, 737 A.2d 622; *Giles v. State,* 8 Md.App. 721, 723, 261 A.2d 806 (1970). Therefore, a rob-

---

**3.** Pursuant to Article 27, § 486(b)(1), the statutory offense of robbery retains its judicially determined meaning, "except that a robbery conviction requires proof of intent to deprive another of property." Additionally, § 486(b)(2) provides that robbery includes "obtaining the service of another by force or threat of force."

bery can be accomplished "either [by] a combination of a larceny and a battery or a combination of a larceny and an assault, of the 'putting in fear' variety." *Tilghman v. State*, 117 Md.App. 542, 568, 701 A.2d 847 (1997), *cert. denied*, 349 Md. 104, 707 A.2d 90 (1998); *see Snowden v. State*, 321 Md. 612, 617, 583 A.2d 1056 (1991). In any event, the degree of force necessary to constitute a robbery is immaterial, " 'so long as it is sufficient to compel the victim to part with his property.' " *West v. State*, 312 Md. 197, 205, 539 A.2d 231 (1988) (citation omitted); *see Douglas v. State*, 9 Md.App. 647, 653–54, 267 A.2d 291 (1970). Generally, the use of a deadly weapon constitutes "the necessary element of force or violence or putting in fear sufficient to raise the taking of property from the person from larceny to robbery." *Bowman*, 314 Md. at 730, 552 A.2d 1303. On the other hand, the sudden snatching of property, without violence or putting in fear, would not amount to a robbery. *Id.* at 729, 552 A.2d 1303.

Terfa testified that appellant pointed the handgun at him, but he could not open the register because he was too nervous. Similarly, Smith–Barton claimed that the muzzle of the handgun was pointed at both employees, and appellant threatened them by telling them to "open the register or I'll blow your heads off." Although appellant had put the gun in his pants just before he grabbed the pack of cigarettes, Terfa testified that he did not try to stop appellant from taking the cigarettes because "he had a gun."

The recent case of *Metheny v. State, supra*, 359 Md. 576, 755 A.2d 1088, is pertinent. There, the Court stated that "the intent to steal must occur at the time of the taking and not necessarily at the time the force is applied to neutralize the victim prior to the robbery." *Id.* at 606, 755 A.2d 1088. It added that "robbery does not require 'that the defendant's violence-or-intimidation acts be done for the very purpose of taking the victim's property.... [It is] enough that he takes advantage of a situation which he created for some other purpose....' " *Id.* (quoting *Stebbing v. State*, 299 Md. 331, 353–54, 473 A.2d 903, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984)). The Court explained:

"If the force precedes the taking, the intent to steal need not coincide with the force. It is sufficient if there be force followed by a taking with intent to steal as part of the same general occurrence or episode. Even if the force results in death, a taking and asportation after the death is nevertheless robbery."

*Metheny,* 359 Md. at 606, 755 A.2d 1088 (quoting *Stebbing,* 299 Md. at 356, 473 A.2d 903).

Further, the *Metheny* Court said, 359 Md. at 606, 755 A.2d 1088:

*Stebbing* is an exception to the general requirement that the intent to commit a crime accompany a forbidden act. [Citation omitted]. This exception, however, is justified, in part, because a felon who applies force to neutralize a victim should be held responsible for that action if the felon later decides to take advantage of the situation by robbing the victim. In essence, we have allowed, in such circumstances, for a constructive concurrence of the force and intent to steal at the time of the taking.

It is also noteworthy that robbery is ordinarily viewed as a continuous offense, not completed until the felon escapes to a point of safety. *See Ball,* 347 Md. at 188, 699 A.2d 1170. Therefore, "[t]he mere fact that some asportation has occurred before the use of force does not mean that the perpetrator is thereafter not guilty of the offense of robbery." *Id.; see Sydnor v. State,* 365 Md. 205, 218, 776 A.2d 669 (2001); *Watkins v. State,* 357 Md. 258, 744 A.2d 1 (2000).

Viewing the facts in light of the applicable law, and in the light most favorable to the State, we readily conclude that the evidence was sufficient for the jury to find the necessary element of intimidation in connection with the taking of the cigarettes. Given that robbery is usually regarded as a continuous offense, the seizure of the cigarettes was part of the robbery. Moreover, by using a gun just moments before appellant seized the cigarettes, the jury could reasonably conclude that appellant capitalized on the intimidating situation that he created; he had so frightened the employees that

they were unable or unwilling to interfere with his conduct in taking the cigarettes.

### B. *One Armed Robbery or Two*

■■■ In summary fashion, appellant argues that even if there was sufficient evidence of an armed robbery, there was only one armed robbery, not two. He asserts that there was only a single act of taking from one entity, despite the fact that two employees were present in the store.[4]

The State asserts that Facon's contention as to a single taking is not preserved, because Facon did not assert below, as he does here, that a single act of theft from one entity, coupled with force, constitutes only one robbery. Instead, he argued below that Barton–Smith "showed up. She thought the person was a customer. She heard these things. But I would maintain, Your Honor, that she herself was not the person from whom property was taken."

In *Ware v. State,* 360 Md. 650, 668, 759 A.2d 764 (2000), *cert.* denied, 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001), the Court reiterated that an argument not made to the trial court is waived on appeal. We agree that this precise contention was not presented at trial. Even if preserved, however, we are satisfied that, under the particular facts of this case, appellant's claim lacks merit. We explain.

While this case was pending, appellant's contention was put to rest, in the recent case of *Borchardt v. State, supra,* 367 Md. 91, 786 A.2d 631 (2001). There, the defendant was convicted, *inter alia,* of two counts of murder in connection with a robbery of a couple at their home, for which he was sentenced to death. Although much of the case concerns the constitutionality of Maryland's death penalty statute, in light

---

4. Appellant also contends that there was only one armed robbery because no gun was pointed at Barton–Smith. The State responds that this claim is waived because, at the close of the State's case, Facon never asserted, as he does here, that the State failed to show that the weapon had been pointed at Barton–Smith. We need not address either appellant's contention or the State's preservation claim, given our earlier assessment of the evidence.

of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), other issues were also addressed that are pertinent here.[5]

Borchardt argued, in part, that his right to protection from double jeopardy was violated because he was convicted of two robberies, despite only a "single criminal transaction." *Id.,* 367 Md. at 145, 786 A.2d at 663. He also complained that the evidence was insufficient to support two armed robbery convictions, because the charges arising from the robbery of the wife involved property that actually belonged to her husband. Further, the property was taken from furniture in the hall of the house, not from either victim. The Court squarely rejected these claims.

As to the sufficiency argument, the Court said that although the property, a wallet and its contents, was taken from furniture in the hallway of the home and was owned by the husband, "there is a fair inference that [the wife] had equivalent possession of the desk or chest and thus of the wallet in the chest." *Borchardt,* at 145, 786 A.2d 631. Further, the Court reasoned: "Had [the wife] been alone in the house and stabbed while attempting to prevent Borchardt from removing the wallet, there clearly would have been a robbery; it makes her no less the victim of a robbery that her husband was also present and offered resistance."

In reaching its decision, the *Borchardt* Court relied on *State v. Colvin,* 314 Md. 1, 20, 548 A.2d 506 (1988). In that case, the Court expressly rejected the defendant's contentions that a robbery requires the taking of property from the immediate presence of the victim, and the victim must be the owner of the property. The Court announced: "This is not the law." *Id.* To the contrary, the *Colvin* Court made clear that a conviction for robbery may be upheld "even if the victim of the force is not the owner of the property taken and is not in the immediate presence of the property when it is taken." *Bor-*

---

5. The *Borchardt* Court split four to three. The three dissenters disagreed with the majority's view of the constitutionality of the Maryland death penalty statute.

*chardt,* at 144, 786 A.2d 631 (explaining *Colvin*). Indeed, the *Colvin* Court recognized that "[r]obbery convictions have been sustained where the victim was in one room of a house or place of business and property was taken from another room." *Colvin,* 314 Md. at 20, 548 A.2d 506.

With respect to the double jeopardy claim, Judge Wilner, writing for the majority, recognized that "[d]ecisions are split around the country on whether a defendant may be convicted of more than one robbery when, in a single incident, he or she takes money or other property from the possession or presence of more than one person." *Borchardt,* at 146, 786 A.2d 631. He explained that the double jeopardy analysis often turns on the "the appropriate unit of prosecution of the offense," which is generally resolved "by reference to legislative intent." *Id.* Because robbery was a common law crime when the incident occurred in *Borchardt,* as it was in this case, "a resort to legislative intent [was] not possible." Nevertheless, the *Borchardt* Court expressly held "that the unit of prosecution for the crime of robbery is the individual victim from whose person or possession property is taken by the use of violence or intimidation." *Id.,* at 148, 786 A.2d 631. Accordingly, the Court found that the wife had been robbed of the husband's wallet. *Id.*

In reaching that decision, the Court reasoned that the "single larceny doctrine" applies to the crime of theft, which is a crime against property. *Borchardt,* at 145, 786 A.2d 631. Similarly, we note that in *State v. White,* 348 Md. 179, 192, 702 A.2d 1263 (1997), the Court recognized that, ordinarily, only one larceny occurs when the taking occurs at a single place and time, regardless of the number of items or owners of the items. In contrast, robbery "embodies elements of both larceny and assault." *Borchardt,* at 146, 786 A.2d 631. Indeed, as early as 1921, in *Novak v. State,* 139 Md. 538, 115 A. 853 (1921), *Borchardt* points out that the Court of Appeals "adopted the person assaulted as the unit of prosecution for robbery." *Borchardt,* at 147, 786 A.2d 631; *see also Brown v. State,* 311 Md. 426, 535 A.2d 485 (1988); *Miles v. State,* 88 Md.App. 248, 259, 594 A.2d 634, *cert. denied,* 325 Md. 95, 599

A.2d 447 (1991) (concluding that robbery is a crime against person, not property); *Hartley v. State,* 4 Md.App. 450, 464–465, 243 A.2d 665 (1968), *cert. denied,* 395 U.S. 979, 89 S.Ct. 2136, 23 L.Ed.2d 768 (1969).

As Judge Wilner noted in *Borchardt,* courts in other jurisdictions are divided on the issue of the appropriate unit of prosecution under circumstances attendant here. Generally, states adopting the multiple robbery approach have done so on the basis that the assault aspect of the crime is the primary focus. *Borchardt,* at 146, 786 A.2d 631. Consequently, "the individual victim is the unit of prosecution...." *Id.* As we have seen in our research, these courts seem to conclude that "there are as many robberies as there are victims assaulted." *United States v. Szentmiklosi,* 55 M.J. 487, 489 (U.S.C.A.A.F. 2001). In contrast, those states favoring the "one-robbery result" generally "rely on the fact that the property forcibly taken belonged to a single business entity...." *Id.* Therefore, they "tend to emphasize the theft element" of the offense. *Borchardt,* at 146, 786 A.2d 631.

In general, in analyzing the appropriate unit of prosecution, the courts of other states have usually considered whether multiple robbery charges are multiplicitous, and therefore unconstitutional under the double jeopardy clause. But Facon has not asserted multiplicity or a violation of the double jeopardy clause here. In analyzing whether robbery is primarily regarded as a crime against persons or a crime against property, the courts also refer to the importance of discerning legislative intent with regard to whether there is one offense or multiple offenses. Some courts have also considered whether the particular statute in issue provides for different punishments depending on the value of the stolen property, whether the courts are permitted to impose concurrent or consecutive sentences, or whether the state has available other offenses that can be charged for persons who were present at the time of the crime, such as assault.

*Thomas v. Warden,* 683 F.2d 83 (4th Cir.), *cert. denied,* 459 U.S. 1042, 103 S.Ct. 460, 74 L.Ed.2d 611 (1982), is instructive.

In that habeas corpus action, the defendant challenged his multiple bank robbery convictions arising from the taking of money from multiple cash drawers of individual tellers at a bank. He claimed that it was one criminal episode, and the bank tellers were merely "repositories" with respect to property belonging to a single entity. Therefore, he argued that he committed a "single unitary episode" of bank robbery. *Id.* at 84. Applying Maryland substantive law, the Fourth Circuit was satisfied as to "proof of the separate, discrete possession of each of the three bank tellers from whom money was allegedly taken to support three separate convictions." *Id.* at 86.

The court concluded that the "consistent, longstanding interpretation [of the Maryland courts] supports the state's claim that separate units of prosecution, hence multiple punishments, were contemplated by the Maryland legislature in respect of the three armed robbery convictions here in issue." *Id.* at 85. Significantly, the court was persuaded "that the Maryland legislature intended to allow multiple prosecution and sentencing in armed robbery cases involving property owned by a single entity where the property is taken, albeit in a unitary episode, from the lawful possessions of multiple custodians of discrete portions of the property and where each custodian is put under individual armed threat in the course of the taking." *Id.*

In reaching its conclusion that Maryland courts have consistently recognized separate offenses for the robbery of multiple victims in a single episode, the court relied, *inter alia*, on *Smith v. State*, 23 Md.App. 177, 325 A.2d 902 (1974). In that case, the subject property was owned separately by each of the victims who was robbed. The Fourth Circuit also relied on the reasoning of Maryland cases that allow "separate prosecutions of robberies involving custodians rather than owners of property," stating: "Ownership *or* lawful possession or custody is a sufficient predicate for the offense." *Id.* at 85, 325 A.2d 902. *See, e.g., Hadder v. State*, 238 Md. 341, 354, 209 A.2d 70 (1965). Because the "property was taken in a single episode from multiple custodians of property owned by a

single person or entity," *id.* at 85, 325 A.2d 902, the court concluded that "Maryland decisions . . . unmistakably establish as a matter of state law that separate offenses and punishments are legislatively contemplated. . . ."

*Commonwealth v. Rozplochi,* 385 Pa.Super. 357, 561 A.2d 25, *cert. denied,* 524 Pa. 619, 571 A.2d 381 (1989), is also illustrative of the cases that have found the evidence sufficient to support multiple robbery convictions when there is a forceful taking of property belonging to one entity, accompanied by a threat to, or taking from, one or more employees. In *Rozplochi,* the court upheld two robbery convictions arising from a taking at one business establishment. During the robbery, two employees were threatened with a gun, although only one was required to empty the company's safe. Moreover, the robber never took personal property from either employee; the money that was taken belonged solely to the business. Nevertheless, because two employees were threatened in the course of the theft from the business, and the court viewed robbery as a crime against the person, with the focus on the physical danger to each person, the court concluded that the defendant committed two robberies. In support of that result, the court also found that both employees "had a protective concern for the property of [their employer]." *Id.* at 30. Thus, the court determined that when "a defendant threatens to inflict serious bodily injury on two employees in order to effectuate a theft of property from their common employer, the defendant may be convicted of two counts of robbery." *Id.*

*Commonwealth v. Levia,* 385 Mass. 345, 431 N.E.2d 928 (1982), is also noteworthy. There, the defendant robbed two employees of a convenience store, both of whom were behind the counter at the time. Each employee surrendered money belonging to the store; one took the money from the cash register, and the other employee, who usually pumped gas, gave the robber money from his pocket that belonged to the store. In upholding two armed robbery convictions, the court rejected the defendant's claim that only one robbery occurred because the property belonged to a single entity. In reaching

that conclusion, the Massachusetts court "stressed" the assault aspect of the crime, *id.* at 930, rather than focusing on "the entity to which the money belongs." *Id.* at 931. Further, the court reasoned that the " 'essence of robbery ... is not affected by the state of the legal title to the goods taken.' " *Id.* at 930 (citation omitted).

In addition, after considering the legislative intent, that court was satisfied that two robberies occurred when two persons were put in fear while property of their employer was taken from them. Moreover, it ruled the multiple convictions did not violate the double jeopardy clause of the Fifth Amendment. *Id.* at 929. The court said, at 431 N.E.2d at 931:

> In light of the emphasis ... on the assault element of the crime of robbery, we conclude that the 'offense' is against the person assaulted, and not against the entity that owns or possesses the property taken. So long as the victim of the assault has some protective concern with respect to the property taken, and the property is taken from his person or presence, then the defendant may be convicted and sentenced for a separate and distinct robbery as to that person.

*People v. Wakeford,* 418 Mich. 95, 341 N.W.2d 68, 75 (1983), is also useful. In that case, the court ruled that the double jeopardy clause was not violated when the defendant was convicted and sentenced for two counts of armed robbery at a grocery store, because money was taken from two cashiers. The court noted that the "gravamen of the offense is the armed assault on a person when combined with the taking of money or property." *Id.* at 75. Moreover, it observed that other statutes protect property, but the "primary purpose" of the robbery statute is to protect persons. *Id.* Therefore, it determined that, unlike larceny, where the "unit of prosecution" is the taking at a single time and place, without regard to the number of items taken, the unit of prosecution for robbery is the number of persons assaulted and robbed. *Id.*

Many other courts have adopted the multiple robbery approach. *See, e.g., United States v. Gibson,* 820 F.2d 692 (5th

Cir.1987) (upholding two convictions under 18 U.S.C. § 211 for robbing two tellers at post office); *People v. Ramos,* 30 Cal.3d 553, 180 Cal.Rptr. 266, 639 P.2d 908, 928–29 (1982), *rev'd on other grounds,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (upholding two robbery convictions when force or fear was applied to two victims in joint possession of property); *People v. Jones,* 50 Cal.Rptr.2d 46, 42 Cal.App.4th 1047 (1996) (upholding convictions for seven counts of robbery committed at a store, where store employees were in possession of store property); *State v. Shoemake,* 228 Kan. 572, 618 P.2d 1201 (1980) (concluding that defendant was properly convicted of two armed robberies when grocery store's property, in possession or custody of two employees, was forcibly taken from them, but reversing third robbery conviction as to employee from whom no property was taken); *Commonwealth v. Donovan,* 395 Mass. 20, 478 N.E.2d 727, 735 (1985) (stating that unit of prosecution in armed robbery is the person assaulted and robbed); *State v. Lawson,* 217 N.J.Super. 47, 524 A.2d 1278 (1987)(by assaulting two security guards who attempted to stop robber from fleeing store, robber was properly convicted of two robberies); *State v. Jones,* 344 S.C. 48, 543 S.E.2d 541, 544 (2001) (concluding that defendant may be charged with separate robbery offenses when there is a threat to each person from whom property is taken); *Ex parte Hawkins,* 6 S.W.3d 554, 560 (Tex.Cr.App.1999) (concluding that unit of prosecution in robbery is the same as for assault); *Jordan v. Commonwealth,* 2 Va.App. 590, 347 S.E.2d 152 (1986)(upholding two robbery convictions where robber ordered one restaurant employee to place money from the cash register in a bag, and ordered another employee to remove money from pockets that belonged to restaurant); *see also State v. Johnson,* 499 S.W.2d 371 (Mo.1973); *State v. Ballard,* 280 N.C. 479, 186 S.E.2d 372 (1972); *Clay v. Commonwealth,* 30 Va.App. 254, 516 S.E.2d 684, 686 (1999).

To be sure, numerous jurisdictions have reached contrary results, concluding that only one robbery occurs under circumstances analogous to this case. As indicated, these courts have generally based their rulings on the theory that robbery

is a crime against property. Interestingly, some of these jurisdictions have also expressed concern about disproportionate sentences. That is not a serious concern in Maryland, however, because Maryland courts are not mandated to impose consecutive sentences for multiple robberies that occur in one episode. The option for concurrent sentences, and the rule of lenity, protect against unreasonable multiplication of punishment.

In *People v. Borghesi*, 40 P.3d 15 (Colo.App. 2001) , *cert. granted*, 2001 WL 206009, 2002 Colo. LEXIS 69 (Colo.2002), for example, the court concluded that the defendant was improperly charged with two robberies at one bookstore. Although two clerks were threatened, the court treated the crime as one against property. The court thus determined that the charges were multiplicious and unconstitutional. Moreover, because Colorado law requires mandatory consecutive sentences for aggravated robbery when the crimes arise out of the same criminal episode, the court noted its concern about disproportionate sentencing.

In *United States v. Szentmiklosi, supra*, 55 M.J. 487 (C.A.A.F.2001), the Court of Appeals for the Armed Forces found only one robbery where the defendant robbed a money courier who was escorted by a military policeman. It concluded that "forcible taking of property belonging to one entity from the person or presence of multiple individuals jointly or constructively possessing the property on behalf of the entity is one offense." *Id.* at 491. In reaching that decision, the court said there was no indication of statutory intent to permit multiple convictions and punishments. *Id.*

For other cases finding a single robbery offense, *see, e.g., United States v. Canty*, 469 F.2d 114 (D.C.Cir.1972) (holding that robbery of four bank tellers did not constitute a separate "taking" within meaning of the federal bank robbery statute and therefore defendant could not be convicted of four counts of robbery in a single incident); *People v. Nicks*, 23 Ill.App.3d 435, 319 N.E.2d 531 (1974), *rev'd in part on other grounds*, 62 Ill.2d 350, 342 N.E.2d 360 (1976) (holding that robbery of store

owner and two cashiers, separately but in one episode, constituted one armed robbery); *Allen v. State*, 428 N.E.2d 1237, 1240 (Ind.1981) (finding one robbery as to credit union, because essence of robbery is a taking; the credit union was the sole subject of the taking, although several tellers were assaulted); *Rogers v. State*, 272 Ind. 65, 396 N.E.2d 348 (1979) (holding that defendant who robbed grocery store by taking money from two employees was guilty of one armed robbery); *State v. Whipple*, 156 N.J.Super. 46, 383 A.2d 445 (1978) (holding that defendant's robbery of a liquor store and its owner constituted a single transaction); *State v. Potter*, 285 N.C. 238, 204 S.E.2d 649 (1974) (although lives of multiple employees in store are threatened by use of firearm incident to theft of employer's property, only one robbery was committed); *State v. Collins*, 174 W.Va. 767, 329 S.E.2d 839 (1984) (viewing robbery as "an aggravated form of larceny" and concluding that offense is a single larceny); *see also State v. Faatea*, 65 Haw. 156, 648 P.2d 197 (1982); *State v. Perkins*, 45 Or.App. 91, 607 P.2d 1202 (1980); *State v. Johnson*, 48 Wash. App. 531, 740 P.2d 337 (1987).

 As *Borchardt* unequivocally makes clear, Maryland follows the principle that the appropriate "unit of prosecution" in a robbery case turns on the number of persons assaulted in the course of the taking. Accordingly, appellant committed two armed robberies.

 Nevertheless, we caution that not every employee who is present at a place of business when a robbery occurs would necessarily be the victim of that offense. As we stated earlier, robbery is the taking and carrying away of property from the person of another by the use of violence, force, or intimidation. Some places of business are quite large in area, and an employee could be completely unaware of a robbery occurring elsewhere at the premises. But, "[a] charge of robbery may be sustained by proof that the property was forcibly taken from the care, custody, control, management or possession of one having a right superior to that of the robber," *Johnson v. State*, 9 Md.App. 143, 146–47, 262 A.2d

792 (1970), which could include an employee of a business. Although an employee need not have legal title to property that is taken by force in order to be a victim of robbery, the employee must have a legal interest in the property, such as care, custody, control, or possession. *See Miles,* 88 Md.App. at 259, 594 A.2d 634. Such custody or possession may be either actual or constructive, and individual or joint, so long as the property is taken by force or intimidation.

The evidence here leads inescapably to the conclusion that both employees had joint possession, custody, or control of the pack of cigarettes that belonged to their employer. *Cf. Herbert v. State,* 136 Md.App. 458, 464, 766 A.2d 190 (2001). Indeed, Facon did not suggest in his brief that the employees lacked the requisite custody of the cigarettes for purposes of a robbery offense, and he acknowledged that the property was taken from their presence. As both employees were threatened at gun point just before the property belonging to their employer was taken, and the property was in their protective custody, we conclude that appellant committed two armed robberies, not one.

### C. *Sufficient Evidence of Assault*

Appellant argues that his convictions for first degree assault against Barton–Smith must be reversed because there was no evidence that he pointed a handgun at her. Appellant's contention is without merit, for the reasons already articulated.

### D. *Sufficient Evidence of a Handgun*

Appellant argues that there was no direct evidence that he used a handgun during the robbery. Therefore, he argues that his convictions for use of a handgun in the commission of felony, first degree assault, and armed robbery must be reversed. We disagree.

A "handgun" is defined as "any pistol, revolver, or other firearm capable of being concealed on the person[.]" Art. 27, § 36F(b). First degree assault is an assault by

firearm, which includes a handgun. *See* Art. 27, § 12A–1(a)(2)(i). Robbery with a dangerous or deadly weapon requires the use of a device that is "inherently dangerous or deadly or that may be used with dangerous or deadly effect." *Brooks v. State*, 314 Md. 585, 599, 552 A.2d 872 (1989). Under the facts of this case, there was sufficient evidence to sustain appellant's convictions for use of a handgun in the commission of a felony, first degree assault, and armed robbery.

In addition to the testimony of Barton–Smith and Terfa that appellant pointed a gun at them, Terfa was shown the weapon at trial that the police recovered from appellant's car. Terfa stated that it was "exactly the same thing" that was used in the robbery. Although Barton–Smith could not see the entire gun, she was certain that she saw a gun and testified that the tip of it was silver. Moreover, a few days after the robbery, as Ms. Young prepared to sell the car she owned with appellant, she noticed a handgun in the console. Her cousin confirmed that there was a handgun in the vehicle. Further, the State presented expert testimony establishing that a loaded .38 gun was recovered from Facon's car.

### III.

Appellant argues that the trial court erred in permitting the State to impeach him with two prior armed robbery convictions. We agree with the State that appellant has failed to preserve this argument for our review. We explain.

At the end of the State's case, appellant moved *in limine* to preclude the State from impeaching him with his five prior armed robbery convictions. One conviction occurred in 1989, three in 1994, and one in 1995. After hearing arguments from both parties, the court allowed the State to impeach appellant with the 1989 conviction and one of the 1994 convictions. The defense then proceeded, and appellant was one of the witnesses. At the end of the State's cross-examination of appellant, the State elicited from him that he had two prior armed robbery convictions. Appellant did not object to the impeachment.

In *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988), the Court of Appeals held that when a court denies a motion *in limine,* generally a contemporaneous objection must be made at the time the objectionable evidence is sought to be admitted. Recently, in *Reed v. State,* 353 Md. 628, 638, 728 A.2d 195 (1999), the Court reaffirmed that ruling, stating:

[T]he rule from *Prout* as to rulings on motions *in limine* that result in the admission of evidence is that the contemporaneous objection rule ordinarily applies. When the evidence, the admissibility of which has been contested previously in a motion *in limine,* is offered at trial, a contemporaneous objection generally must be made pursuant to Maryland Rule 4–323(a) in order for that issue of admissibility to be preserved for purposes of appeal.

Appellant has also failed to preserve his claims for another reason; he did not present below the particular arguments that he advances here. *See* Md. Rule 8–131(a); *Walker v. State,* 338 Md. 253, 262, 658 A.2d 239, *cert. denied,* 516 U.S. 898, 116 S.Ct. 254, 133 L.Ed.2d 179 (1995); *Jacobs v. Flynn,* 131 Md.App. 342, 376, 749 A.2d 174, *cert. denied,* 359 Md. 669, 755 A.2d 1140 (2000).

Facon asserts in his brief that the impeachment value of a prior conviction for armed robbery "is less than that of prior convictions for crimes that are inherently deceitful, involve dishonesty, and are universally recognized as crimes that adversely reflect on a witness's honesty." This claim was not made below, however. Similarly, although Facon argued below that the length of time since the 1989 conviction weighed against the admission of that conviction, he made no such argument with respect to the 1995 conviction. Thus, that aspect of his claim is also waived. In addition, Facon argues here that neither the importance of his testimony nor the centrality of his credibility justified admission of the prior convictions. In arguing to the court below, Facon recognized that the jury had to choose whether to believe the State's version of events or his version. Thus, this contention is also not properly before this Court. *See Williams v. State,* 344 Md. 358, 371–72, 686 A.2d 1096 (1996).

Even if the various claims are preserved, appellant would fare no better. We explain.

Maryland Rule 5–609 governs the admission of prior convictions for impeachment purposes. The rule essentially creates a three-part test for admissibility. First, the conviction must be within the "eligible universe" of convictions that may be used to impeach a witness's credibility. *See* Md. Rule 5–609(a). Second, the conviction must not be more than fifteen years old, reversed on appeal, or the subject of a pardon or a pending appeal. *See* Md. Rule 5–609(b), (c). Third, the trial court must weigh the probative value of admitting the conviction against the danger of unfair prejudice to the witness. *See* Md. Rule 5–609(a).

In resolving impeachment questions concerning prior convictions, courts consider several factors when weighing the probative value of a past conviction against its prejudicial effect. These include: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility. *Jackson v. State*, 340 Md. 705, 717–19, 668 A.2d 8 (1995).

Armed robbery is an infamous crime and thus has impeachment value. *Passamichali v. State*, 81 Md.App. 731, 736, 569 A.2d 733, *cert. denied*, 319 Md. 484, 573 A.2d 808 (1990). Moreover, as appellant concedes, the two prior convictions that were admitted occurred within the fifteen-year limit established by Maryland Rule 5–609. To be sure, the similarity of the prior convictions and the charged offense weighed against admissibility. But, prior convictions that are similar to the crime for which the accused is on trial are not automatically excluded under Rule 5–609. *See Jackson*, 340 at 711, 668 A.2d 8. Indeed, whether the prior convictions are similar to the charges for which an accused is on trial is only one consideration in the balancing process. *See id.*

As to the issue of same crime impeachment, what the Court of Appeals stated in *Jackson*, 340 Md. at 714, 668 A.2d 8, is pertinent here:

[W]e conclude that a prior conviction that is the same as or similar to the crime charged is not *per se inadmissible,* but is subject to the probative-prejudice weighing process under Rule 5–609. The balancing prong of the rule contains no language prohibiting the use of similar prior crimes. Furthermore, we believe a per se rule barring same-crime impeachment would deny trial judges needed flexibility. Establishing such a per se rule would have the additional undesirable effect of shielding a defendant who specializes in a particular crime from cross-examination regarding his specialty crimes.... We therefore reject Appellant's contention that same-crime impeachment evidence is per se inadmissible. (Citations and footnote omitted).

In this regard, we note that appellant's credibility was of particular importance to this case. He wanted the jury to believe his version of the incident, *i.e.,* that he was high on drugs at the time of the robbery, did not use a real handgun, and did not intend to steal cigarettes. The State obviously had a different theory.

In sum, factors one, four, and five weigh in favor of the State, factor two is neutral, and factor three weighs in appellant's favor. Under the circumstances, we perceive no error or abuse of discretion by the trial court in admitting two of appellant's five prior armed robbery convictions.

## IV.

Appellant contends that the trial court erred in overruling his objection to the State's closing argument. The prosecutor argued that, under Maryland law, the facts of this case permitted two armed robbery convictions because both victims were in control of the store and were assaulted. Because of our holding in section II, we perceive no error in the trial court's ruling.

## V.

■ Appellant argues that the trial court erred at sentencing by imposing twenty-five years of imprisonment, without the possibility of parole, for each armed robbery conviction, pursuant to Art. 27, § 643B(c). The State agrees with appellant's argument, as do we.

■ When a defendant is convicted of more than one qualifying crime of violence as the result of a single incident, only one sentence may be imposed under § 643B(c). *Jones v. State*, 336 Md. 255, 262, 647 A.2d 1204 (1994); *State v. Taylor*, 329 Md. 671, 674, 621 A.2d 424 (1993). Accordingly, we shall vacate one of appellant's sentences for armed robbery.

**SENTENCE VACATED AS TO ONE ARMED ROBBERY CONVICTION. JUDGMENTS OTHERWISE AFFIRMED. COSTS TO BE PAID FOUR–FIFTHS BY APPELLANT and ONE–FIFTH BY PRINCE GEORGE'S COUNTY.**