983 A.2d 542

Donald Ray GREGORY

v.

STATE of Maryland.

No. 2204, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Nov. 24, 2009.

22

Julia C. Schiller (Nancy S. Forster, Public Defender, on brief), for Appellant.

Sharon S. Street (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: HOLLANDER, MEREDITH and KEHOE, JJ.

**24**

HOLLANDER, J.

Donald Ray Gregory, appellant, was charged with attempted felony theft and attempted unlawful taking of a motor vehicle. At his jury trial in the Circuit Court for Wicomico County, he claimed that he did not intend to steal the vehicle, and took it because he mistakenly believed that he was God. The jury convicted appellant of both offenses.[1]

On appeal, Gregory presents the following questions for our review:

 I. Did the trial court err in failing to properly advise the appellant about his right not to testify?

 II. Did the trial court err in allowing appellant to be impeached with his prior convictions for robbery and theft when appellant was on trial for attempted theft?

 III. Did the trial court err in failing to give the jury instruction on mistake of fact?

 IV. Was the evidence sufficient to sustain the convictions for attempted unlawful taking of a motor vehicle and attempted theft over $500?

Finding no error, we shall affirm the judgments of the circuit court.

## FACTUAL SUMMARY

The following evidence was adduced at the trial in November 2007.

On May 17, 2007, Brenda Huffman lived on Laurel Road in Mardela Springs and owned a 2004 Hummer H2 truck. She testified that, on that date, she went out with her mother, and the two returned to her home at approximately 3:35 p.m. At that time, she saw an unfamiliar truck in her front driveway, which was running. In her rear driveway, where her 2004

---

1. The court sentenced appellant to fifteen years' incarceration, with all but one year suspended, for felony theft. For sentencing purposes, the court merged the attempted unlawful taking conviction, pursuant to Md.Code (2002, 2005 Supp.), § 7–105(d)(2) of the Criminal Law Article.

Hummer H2 was parked, Huffman discovered appellant sitting in the driver's seat, with "his hands ... in the floorboard area." At trial, she identified appellant as the individual she observed on the driver's side of her vehicle.

When Huffman asked appellant "what he was doing," appellant exited the Hummer and told Huffman that he "needed to take the truck." Huffman asked appellant "what was wrong[,]" because he "just didn't seem right and he kept saying he was in distress." Appellant replied "that God told him [that] he could take the truck." After appellant told Huffman that "he wasn't going to leave without the truck[,]" Huffman called the police.

Huffman had left the Hummer unlocked, although the keys to the Hummer were not in the vehicle. She examined the interior of the vehicle and saw "wiring hanging" underneath the dashboard of the Hummer. These wires were not hanging down before appellant entered her vehicle. Huffman purchased the Hummer for $49,000.

Joyce Caudill, Huffman's mother, testified that she drove her daughter home on May 17, 2007. Upon arriving, they saw a man in her daughter's truck. Ms. Caudill identified appellant as the man. Ms. Caudill and her daughter approached appellant and asked him what he was doing. Appellant told them that "God had told him to take the truck," and he could not leave without it. While inside of the truck, appellant was leaning toward the floorboard of the vehicle. Ms. Caudill told appellant to get out of the truck and he complied.

Trooper Richard Lee Hagel, Jr. of the Maryland State Police, responded to Huffman's home at approximately 3:59 p.m. He saw appellant "standing approximately [twenty] feet behind the Hummer[.]" Appellant's vehicle, a 1991 or 1992 Blazer, was parked at the end of the driveway, and it was running. Appellant, who was cooperative, told the trooper that

he was driving by and ... heard a voice inside his truck that told him [that] he had to take the Hummer. So he stopped, pulled into the driveway, and attempted to take the

Hummer. He said that the voice he had heard in his truck, he believed there was a device in his truck that allowed . . . God to speak to him.

The defense moved for judgment of acquittal. As to the charge of motor vehicle theft, appellant's attorney argued that "the State has not shown that the Defendant's actions were knowing and willful. . . ." The court denied the motion.

Appellant was the sole witness for the defense. We quote from his direct examination:

[DEFENSE COUNSEL]: [O]n May 17th at any time during the day were you in Mardela . . . ?

[APPELLANT]: At Brenda Huffman's place, the place where I was arrested, that's where I was but I had been there well before the police was called, possibly an hour or two hours before the police was called.

[DEFENSE COUNSEL]: When did you arrive there?

[APPELLANT]: [A]pproximately [fifty] minutes to an hour before her daughter's school bus arrived.

[DEFENSE COUNSEL]: And what were you doing there?

[APPELLANT]: I was having vehicle trouble. My intention was to pull in her driveway, [make a] three point turn [and] head back to where I just came from[.]

\* \* \*

[DEFENSE COUNSEL]: Well, after you pulled into her driveway, what happened?

[APPELLANT]: My truck—well, when I went to slow down to pull into her driveway, there was an issue about this truck coming to a stop. . . .

\* \* \*

So I came in at a speed more than enough to slow down and I buckled into their driveway. . . . So I got in there and I heard this sound, which I hadn't heard before, as if something snapped. . . . And I hit like it went in gear . . . but the tires just spun. . . .

\* \* \*

So I was just at this house and I seen the driveway facing, there's a house right there, I see a Hummer truck[.] ...

\* \* \*

... I'm just sitting there, I'm thinking about this Hummer, I'm looking at the Hummer, I'm looking at the truck, I'm like[,] well[,] I keep going through so much stuff with my truck, I keep having to get it fixed every now and then[.] ...

So I said well, I'll keep going through the stuff. So it told me that this Hummer truck, ... once the voice said that, it told me that, said this Hummer, the only thing in the yard said this Hummer, it said, told me the Hummer was mine. [DEFENSE COUNSEL]: The voice told you to take the Hummer? Did you know whose voice it was?

[APPELLANT]: ... I actually thought that my truck was communicating with me. . . .

Anyhow, I got that telepathy, it was telepathed to me that message there that this Hummer was mine. . . .

\* \* \*

And so anyway, ... I'm looking at the Hummer. I opened the door. . . . I did not get inside of it. And then I closed the door. And I was headed back to my truck. [A]t that exact time, ... the school bus was coming up. And it was a girl, I suppose she was about [eleven] or [thirteen] years old[.] And ... what I said to the little girl, I said listen. I said I am God and my truck knows that I am God. I said my truck will not leave your yard. I said that I want your family to let me have this Hummer. . . . And she said, well, you want me to get my dad. I said, yeah. And she was off. And she went to the house. And so I expected that her father was ... going to come outside. . . .

\* \* \*

... I didn't immediately go into the Hummer. I waited out there [for] three minutes, five minutes, ... I'm looking at this Hummer because now I'm confident that I'm going to get this Hummer because also even if it was about

**28**

money, I could afford the Hummer. And so I'm looking at the green paint and . . . the wheels . . . and I seen that the windows are tinted. So I was like, well, she's going to tell him . . . I'm out here about this truck, so I'm going [to] look inside the truck. So I'm like[,] they know I'm here, . . . so I opened the door. And I sat in the driver's seat. . . .

And from my left I could see a black Dodge Nitro . . . coming up[.] And . . . I saw it was two ladies. . . . I got out of the truck [and] went straight to them. . . . I told them, exactly what I said, I have an emergency, I need this Hummer, . . . I said I need this truck, and I am God. And she said something, that's all good you have an emergency, she said, but what are you doing in my truck. And I said listen, I don't want [you to] tell anybody, I said I'm God. . . .

* * *

[DEFENSE COUNSEL]: Did you intend to steal the Hummer?

[APPELLANT]: No. I wasn't even thinking about the Hummer at all until it was mentioned. Once I had got in that yard and that voice put that thought in my head about the Hummer, which it told me that it's mine, which I believe everything is mine anyway because I truly believe that I am God, but I know the world don't have to agree with that, . . . so I try to live and make it throughout the world not causing trouble. So until they put that in my mind, I wasn't going to take their Hummer, I was going to let her know . . . the secret, listen, I do believe I am God and I actually told her I am.

During the State's cross-examination of appellant, the following colloquy occurred:

[THE PROSECUTOR]: So the voice told you to take the truck?

[APPELLANT]: No, the voice didn't tell me to do anything, the voice spoke to me, just posed it out there, just threw it in my head that the Hummer is yours, it's yours, and my truck broke down at the same time it tells me that.

[THE PROSECUTOR]: Is the truck titled in your name?

\* \* \*

[APPELLANT]: So are you asking me do I believe that, of course, I knew I didn't have ownership of the Hummer.

[THE PROSECUTOR]: The truck wasn't yours and you knew it wasn't yours?

[APPELLANT]: Excuse me, my intention was to make the Hummer mine by getting it from this family.

We shall include additional facts in our discussion.

## DISCUSSION

■ The first contention concerns the advisement appellant received as to his rights to testify or remain silent. We pause to review additional facts.

Following the close of the State's case, the following colloquy occurred:

[DEFENSE COUNSEL]: [Appellant], as I have explained to you in the back there a few moments ago, the State has rested [its] case. This is now your case and you will have the opportunity to testify or decline to testify, as I explained to you. If you elect to testify, you must do so under oath from the witness stand right up there as you've seen the other witnesses do, and you will be subject to cross-examination, that is the State's Attorney may ask you questions and the Court, if [it] chooses to, may also ask you questions. You are not required to testify, you have the right to testify. If you decline [to] testify, the Court will make no inference and will instruct the [jury], if you request, to make no inference of your refusal to testify as to your guilt or innocence.

Do you understand your right to testify?

[APPELLANT]: I do not decline to testify.

[DEFENSE COUNSEL]: Do you wish to testify?

[APPELLANT]: I wish to testify.

[DEFENSE COUNSEL]: He wishes to testify.

THE COURT: The only other thing and maybe [defense counsel] told you this, [appellant], is that if you have a criminal history which contains what are known as impeachable offenses, then perhaps the State can ask you questions about those or bring it to the jury's attention, do you understand that? Subject to various restrictions.

[DEFENSE COUNSEL]: Essentially if the State wishes to, [it] could ask you about your prior criminal record, okay. To indicate to the jury that a person with a criminal record like this shouldn't be believed, would be [an] attack upon your credibility.

Prior to the State being able to do that, the Court must essentially hold a hearing and do a balancing test as to whether or not those instances would be more prejudicial than illuminating to the jury. But it's a possibility that the State could ask you about your prior record, yes.

Do you still wish to testify?

[APPELLANT]: I do.

Thereafter, as noted, appellant testified in his own defense.

Appellant challenges the advisement by the court and defense counsel, characterizing it as "facially erroneous." In particular, he complains that the "court and defense counsel's on-the-record advice of rights ... was not accurate as to what prior convictions could be used to impeach" him if he elected "to take the stand." He asserts:

[T]here can be no question that not every felony conviction can be used to impeach a criminal defendant.[2] Notwithstanding that fact, the appellant in this case was led to believe that his criminal history and criminal record could be used to impeach him if he chose to testify. Additionally, neither the trial court nor defense counsel informed appellant that the conviction could not be more than fifteen years old. Md. Rule 5–609(b).

---

2. Appellant argues that he trial court erred in allowing him to be impeached with his prior convictions for robbery and theft. We discuss this contention, *infra.*

"As a result of defense counsel's incomplete advice," claims appellant, he "lacked sufficient legal information necessary to make a knowing and intelligent decision whether to testify." *See Martin v. State,* 73 Md.App. 597, 601–02, 535 A.2d 951 (1988) (a defendant " 'cannot be charged with a waiver of the [right not to testify] unless [the defendant] voluntarily and intelligently elected to refrain from asserting it' " quoting *People v. Chlebowy,* 191 Misc. 768, 78 N.Y.S.2d 596, 600 (1948)). According to appellant, the court "was put on clear notice that [appellant] was not sufficiently informed (by his lawyer) of the constitutional rights that he was deciding whether to exercise or waive," and therefore "the court had a *sua sponte* duty to intervene to assure that he was properly informed about his rights." In appellant's view, the "court committed reversible error [by] failing to intervene [and] accurately ... explain his constitutional right [to testify] or to instruct defense counsel to do so[.]" *See Tilghman v. State,* 117 Md.App. 542, 564, 701 A.2d 847 (1997) (stating that "if it is ... manifest to the court that [a] defendant is deciding whether to testify on the basis of erroneous legal advice that will render his decision unknowing and involuntary, the court must take action to assure that the defendant is correctly advised"), *cert. denied,* 349 Md. 104, 707 A.2d 90 (1998).[3]

The State counters that, because appellant "raised no objection below to the ... court's advisement, ... he should not be heard to complain now." *See* Rule 8–131(a).[4] Even if the

---

**3.** The logic of appellant's position is not apparent. In essence, he complains because the advisement suggested that his entire criminal record could be used to impeach him, even though only certain convictions qualified under Rule 5–609. Nevertheless, believing that his whole record was fair game, he elected to testify, without realizing that only certain convictions could be used to impeach him. Even assuming any error in the advisement, if appellant chose to testify under the belief that he was subject to more impeachment than the court ultimately permitted, it is not clear how he was harmed.

**4.** Rule 8–131(a) states, in part: "Ordinarily, [an] appellate court will not decide any ... issue [other than jurisdiction over subject matter or a person] unless it plainly appears by the record to have been raised in or decided by the trial court[.]"

claim is preserved, the State contends that the court's advice was not "incomplete" and "defense [counsel's] advice to [appellant] was not inherently, overtly, or facially erroneous." Moreover, the State insists that there is no evidence "that the court was on notice that [appellant] did not understand his rights" or that appellant "relied" on defense counsel's advice, to his detriment, "in deciding whether to testify." Thus, the State maintains that the court did not err in failing to intervene and correct defense counsel's advice.

Assuming, *arguendo*, that appellant's contention is preserved, we conclude that the court did not err in advising appellant as to his testimonial rights. We explain.

 "The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee the accused in a criminal case the right to testify on his own behalf." *Tilghman*, 117 Md.App. at 553, 701 A.2d 847 (citing *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). Because the right to testify is essential to due process in a fair adversary system, it may only be waived knowingly and intelligently, pursuant to the waiver standards established for fundamental constitutional rights in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *See Rock*, 483 U.S. at 51, 107 S.Ct. 2704; *Faretta v. California*, 422 U.S. 806, 819–20 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

 "The privilege against self-incrimination is guaranteed under both Article 22 of the Maryland Declaration of Rights,[ ] and the Fifth Amendment to the United States Constitution, which is made applicable to the States through the Fourteenth Amendment.[ ]" *Smith v. State*, 394 Md. 184, 210, 905 A.2d 315 (2006); *see also Gray v. State*, 368 Md. 529, 549–50, 796 A.2d 697 (2002); *Bhagwat v. State*, 338 Md. 263, 270–71, 658 A.2d 244 (1995). No adverse inference can be drawn against a defendant who elects to exercise this privilege. *See* Md.Code (2006 Repl.Vol., 2009 Supp.) § 9–107 of the Courts and Judicial Proceedings Article; *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). As

the Court of Appeals explained in *Morales v. State*, 325 Md. 330, 335–36, 600 A.2d 851 (1992):

> The decision whether or not to testify is a significant one and must be made with a basic appreciation of what the choice entails. If a defendant elects to remain silent, he or she waives the constitutional right to testify on his or her own behalf. Conversely, if a defendant testifies, he or she waives the constitutional right to remain silent.

If a defendant is represented by counsel, however, a rebuttable presumption arises that counsel has fully advised his client of the right to testify or remain silent. *Thanos v. State*, 330 Md. 77, 91–92, 622 A.2d 727 (1993); *accord Oken v. State*, 327 Md. 628, 639, 612 A.2d 258 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Hamilton v. State*, 79 Md.App. 140, 150, 555 A.2d 1089, *cert. denied*, 316 Md. 550, 560 A.2d 1118 (1989). Moreover, there is no provision that requires that the waiver be obtained in any particular form, that it be placed on the record, or that it be done in open court. *See Tilghman*, 117 Md.App. at 555 n. 5, 701 A.2d 847. In *Tilghman*, this Court said:

> In the trial of a *pro se* criminal defendant, the court must advise the defendant of his constitutional rights to testify and to remain silent, so that he may make an informed choice to invoke one right and waive the other. When the defendant is represented by counsel, no such requirement exists. On the contrary, Maryland law recognizes a presumption, premised on the permitted inference that attorneys, as officers of the court, "do as the law and their duty require them," that a represented defendant has been told of his constitutional rights, by his attorney. Thus, even though the right to testify must be waived by the defendant personally, the trial court is entitled to assume that counsel has properly advised the defendant about that right and the correlative right to remain silent and, if the defendant does not testify, that he has effectively waived his right to do so.[]

*Id.* at 554–55, 701 A.2d 847 (citations omitted).

Notably, the *Tilghman* Court also said, *id.* at 557, 701 A.2d 847:

It is not necessary that a defendant be told of the potential for impeachment with prior convictions for his decision whether to testify to be made knowingly and intelligently. *Martin v. State*, 73 Md.App. 597, 535 A.2d 951 (1988) (Wilner, J.). The risk of impeachment is not a "fundamental attribute" of the right to testify, knowledge of which is essential to an understanding of the right itself. *Hamilton* [*v. State*, 79 Md.App.] at 143, 555 A.2d 1089. Rather, it is a potential consequence of exercising the right to testify that is of largely strategic, not essential, import. *See also Morales*, 325 Md. at 337–39, 600 A.2d 851 (while a trial judge is not required to inform the defendant of the risk of impeachment by prior convictions, a judge who decides to do so must provide accurate advice).

With respect to a defendant's testimonial decision, Maryland Rule 5–609 is relevant. It states, in part:

**Rule 5–609. Impeachment by evidence of conviction of crime.**

(a) **Generally.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.

(b) **Time limit.** Evidence of a conviction is not admissible under this Rule if a period of more than 15 years has elapsed since the date of the conviction. . . .

*Thanos, supra*, 330 Md. 77, 622 A.2d 727, is instructive as to whether the court below erred by failing to correct defense counsel's advice to appellant regarding his right to testify. Charged with first degree murder and related offenses, Thanos was advised by his counsel that, if he elected to testify, he would be subject to cross-examination by the prosecutor, who "could inquire into any prior convictions" that Thanos had.

*Id.* at 81, 90, 622 A.2d 727 (emphasis in original). Thanos subsequently waived his right to testify. *Id.* at 90, 622 A.2d 727. After he was convicted, Thanos contended on appeal that, because "he had several prior convictions which, for various reasons, were not admissible for impeachment purposes," his counsel's "advice was incorrect[.]" *Id.* at 82, 90, 622 A.2d 727. Moreover, claiming that he relied on that "incorrect advice," Thanos argued that "he did not knowingly and intelligently waive his right to testify[.]" *Id.* at 90–91, 622 A.2d 727.

Affirming Thanos's convictions, the Court of Appeals stated:

In *Gilliam v. State,* 320 Md. 637, 579 A.2d 744 (1990), [*cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991),] we reaffirmed a long-standing rule that criminal defendants represented by counsel are presumed to have been informed of their constitutional rights, including the right to testify. Thus, trial judges have no affirmative duty to inform represented defendants of their right to testify except "where it becomes clear to the trial court that the defendant does not understand the significance of his election not to testify or the inferences to be drawn therefrom...." [*Id.*] at 652–53, 579 A.2d 744. We held further that an ambiguity in an on-the-record colloquy between the defendant and his counsel concerning the right to testify will not necessarily undermine a knowing and intelligent waiver of that right:

Where there is no indication that the defendant has a misperception of his right to remain silent and the effect of exercising that right, and where he expressly indicates [that] he has been fully advised of and understands the right, as well as the effect of a waiver, then an ambiguous statement made by defense counsel during an "on the record" explanation does not result in reversible error if the trial court fails to intervene and clarify counsel's ambiguous statement.

*Id.,* 320 Md. at 656, 579 A.2d 744....

*Gilliam* controls the instant case. The record gives no hint that counsel's questionable advice influenced Thanos's decision not to testify. Before the trial began, Thanos stated on the record that he had no intention to testify. He confirmed to the court at that point that he had discussed with counsel his right to testify and desire to forego that right. Defense counsel subsequently indicated no fewer than three times that the defense would present no evidence. It was only at the conclusion of the State's case that defense counsel made the ambiguous statement about prior convictions to Thanos in explaining his right to testify; but nothing in Thanos's responses suggests that counsel's statement caused him to change his mind about testifying, for the record clearly reflects that he had already decided not to do so.

\* \* \*

Here, Thanos was represented by competent counsel whose ambiguous statement as to prior convictions did not affect Thanos's choice not to testify. Under our decision in *Gilliam*, the trial court did not err in failing to intervene and correct counsel's statement.

*Id.* at 91–92, 622 A.2d 727 (citations omitted). *See Oken, supra,* 327 Md. at 641, 612 A.2d 258 (affirming Oken's waiver of his right to testify where there was "no clear indication that the ... court's advice regarding Oken's right to testify had any influence on his decision not to testify").

*Tilghman,* 117 Md.App. 542, 701 A.2d 847, also provides guidance. There, the defendant's attorney asked: "Do you understand if the States Attorneys [sic] cross exams [sic] you here, and if it's indicated to me that you have a prior conviction that he will ask you about those convictions?" *Id.* at 550, 701 A.2d 847. On appeal, the defendant argued that this advice was misleading because it implied that all prior convictions could be used to impeach his credibility. *Id.* at 551–52, 701 A.2d 847. We held that a trial court has no duty to intervene when a defense attorney provides advice to a client about the risk of impeachment unless the advice is "intrinsical-

ly and facially incorrect," which, the Court ruled, Tilghman's attorney's advice was not. *Id.* at 564, 701 A.2d 847. We said, *id.* at 564–65, 701 A.2d 847:

> In this case, counsel's advice was not inherently, overtly, and facially erroneous. Her admonition that appellant's prior convictions could be used to impeach him was not framed as an incorrect proposition of law that could be readily identified as such by the court. Nor did counsel provide appellant with specific advice that was incorrect on its face.[ ] Although counsel's advice was specific to appellant and to his circumstance, its legal accuracy depended upon, and could not be ascertained fully without knowledge of, appellant's criminal record. To the trial judge, who did not know, and had no reason to know, the nature of appellant's prior convictions, or even if he had any convictions, counsel's advice would not have appeared to be incorrect. Given that counsel's advice was not erroneous *per se,* the presumption of proper advice remained in force, and the trial court did not err.

We reach a similar conclusion here. Before advising appellant on the record regarding his rights to testify and not to testify, defense counsel stated that he had discussed both rights with appellant off the record. Moreover, appellant told the court twice before defense counsel's advisement, and once afterwards, that he intended to testify. Because there is no evidence that defense counsel's advice, even if ambiguous, influenced appellant's decision to testify, the court did not err in failing to intervene and correct any ambiguity in defense counsel's advice.

The court correctly advised appellant that, if he chose to testify, the State could "ask [him] about or bring ... to the jury's attention" any "impeachable offenses" included in his "criminal history." But, appellant was also told that the State could only mention Gregory's "impeachable offenses ... [s]ubject to various restrictions." Thus, appellant was not told that his *entire* criminal history could be used for impeachment.

Moreover, as the State points out, there is no indication that the trial court knew of Gregory's criminal record or prior impeachable convictions. Nor has appellate counsel revealed what was on Gregory's criminal record that would not have been admissible for impeachment purposes. As the State explains, "the legal accuracy of the advice to Gregory" depended upon his criminal record. *See Tilghman,* 117 Md.App. at 565, 701 A.2d 847.

 Even if Gregory was erroneously advised of his rights, the record is devoid of any evidence showing that Gregory relied on the advice in deciding to testify. Detrimental reliance on the erroneous advice is a necessary element in determining that the defendant did not knowingly and voluntarily waive his constitutional right to remain silent. *Morales,* 325 Md. at 339, 600 A.2d 851.

*Morales* stands in marked contrast to the case *sub judice.* Unlike in this case, the appellant in *Morales* initially told the trial judge that he was going to testify in his own defense, and only changed his mind after the judge erroneously advised him concerning the law of impeachment. *Id.* at 334, 600 A.2d 851. The Court of Appeals articulated: "... Morales apparently changed his decision to testify based on the trial court's incorrect implication that all of his prior convictions could be used to impeach him...." *Id.* at 339, 600 A.2d 851. Having found a causal relationship between the court's advice and the change in the defendant's decision not to testify, the Court of Appeals concluded that Morales's "decision to waive his constitutional right to testify" was not knowing, intelligent or voluntary. *Id.* In our view, the element of a causal relationship (between the trial court's advice and the defendant's decision not to testify) was critical to the holding in *Morales. See Yoswick v. State,* 347 Md. 228, 244, 700 A.2d 251 (1997); *Oken,* 327 Md. at 636–42, 612 A.2d 258 (court found no indication that the trial court's remarks influenced Oken's decision not to testify in this case; it denied relief under *Morales* ); *Brooks v. State,* 104 Md.App. 203, 231, 655 A.2d 1311 (1995).

## II.

 Appellant contends that the court erred in allowing him to be impeached with his prior convictions for robbery and theft, because he was on trial for attempted theft. Before addressing this contention, we pause to review additional facts.

During cross-examination of appellant, the State asked to approach the bench, where the following colloquy ensued:

[THE PROSECUTOR]: Your Honor, I would like to inquire of [appellant] whether he was convicted of robbery in Delaware in 1998. Convicted of [misdemeanor] theft in Delaware also in 1998.... Georgetown, Sussex County.

* * *

THE COURT: What year?

[THE PROSECUTOR]: [19]98. So we're within [fifteen] years.

THE COURT: It's within the [fifteen] years, it's an infamous crime, it certainly bears on credibility.

What do you want to tell me, [defense counsel]?

[DEFENSE COUNSEL]: Well, Your Honor, the rule says for the purpose of attacking the credibility of the witness the State can bring these up only if the Court determines that the probative value of admitting the evidence outweighs the danger of unfair prejudice to the witness.

Now, my issue with this is with regard to attacking his credibility. Is the State attempting to prove by admission of these prior offenses that [appellant] is not, in fact, God because that's what he's testified to.

THE COURT: Well, it can bear on other matters of credibility, too.

[DEFENSE COUNSEL]: I understand that, Your Honor.

But, I mean, the Court has heard the discourse of [appellant] and for the State to come up and say, oh, I'm going to attack his credibility to me is an absurdity. The prejudice would clearly outweigh the probative value of this.

[THE PROSECUTOR]: Well, he has denied saying he was going to take the vehicle.

THE COURT: I find the probative value of any such testimony outweighs [the] danger of any unfair prejudice on [appellant].

After the parties returned to their tables, the following colloquy occurred:

[THE PROSECUTOR]: [Appellant], isn't it true in 1998 in Sussex County you were convicted of robbery second degree?

[APPELLANT]: In 1998 I did take a plea to a robbery second degree charge and one theft charge in a plea agreement.

[THE PROSECUTOR]: Theft under, you were convicted of that at the same time.

[APPELLANT]: Taking a plea you are pleading guilty.

Because "the admission of [his] prior convictions was far more prejudicial tha[n] probative[,]" argues appellant, the court abused its discretion in allowing him to be impeached with the convictions. *See* Rule 5–609(a).[5] "[T]he only purpose of admitting evidence of appellant's prior convictions[,]" he claims, "was to paint the picture for the jury that appellant was a bad person and since he did it before, he was more likely to have committed this crime." *See Ricketts v. State*, 291 Md. 701, 703, 436 A.2d 906 (1981) ("The danger in admitting prior convictions as evidence to impeach [a] defendant ... [w]here the crime for which the defendant is on trial is identical or similar to the crime for which he has been previously convicted [is that] the jury may conclude that because he did it *before* he most likely has done it *again.*" (Emphasis in original)). *Accord State v. Westpoint*, 404 Md. 455, 479, 947 A.2d 519 (2008).

The State counters that "[t]he record demonstrates that the ... court properly applied the appropriate balancing test and

---

**5.** As noted, Rule 5–609(a) states: "[E]vidence that [a] witness has been convicted of a crime shall be admitted ... only if ... the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness[.]"

made specific findings regarding the probative value versus the prejudicial effect of the prior convictions." *See Facon v. State,* 144 Md.App. 1, 47, 796 A.2d 101 (2002), *rev'd on other grounds,* 375 Md. 435, 825 A.2d 1096 (2003). According to the State, "the prior convictions possessed high impeachment value" and appellant's "testimony and the centrality of his credibility ... weighed heavily in favor of admitting the prior convictions."

In *Facon,* we reviewed the law governing the admission of prior convictions for impeachment purposes:

> Maryland Rule 5–609 ... essentially creates a three-part test for admissibility [of prior convictions for impeachment purposes]. First, the conviction must be within the "eligible universe" of convictions that may be used to impeach a witness's credibility. *See* Md. Rule 5–609(a). Second, the conviction must not be more than fifteen years old, reversed on appeal, or the subject of a pardon or a pending appeal. *See* Md. Rule 5–609(b), (c). Third, the trial court must weigh the probative value of admitting the conviction against the danger of unfair prejudice to the witness. *See* Md. Rule 5–609(a).

> In resolving impeachment questions concerning prior convictions, courts consider several factors when weighing the probative value of a past conviction against its prejudicial effect. These include: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility.

*Facon, supra,* 144 Md.App. at 47, 796 A.2d 101 (citation omitted).

Notably, we said in *Facon, id.* (citations omitted):

> ... To be sure, the similarity of ... prior convictions and [a] charged offense weigh[s] against admissibility. But, prior convictions that are similar to the crime for which the accused is on trial are not automatically excluded under

Rule 5–609. Indeed, whether the prior convictions are similar to the charges for which an accused is on trial is only one consideration in the balancing process.

Here, the State sought to impeach appellant with his Delaware convictions for second degree robbery and misdemeanor theft.[6] These convictions may be used to impeach a witness's credibility. *See Beales v. State*, 329 Md. 263, 269–70, 619 A.2d 105 (1993) (a prior conviction of theft is "admissible *per se* for impeachment purposes" (italics added)); *Passamichali v. State*, 81 Md.App. 731, 736, 569 A.2d 733 (a prior conviction of robbery is "*per se* admissible for impeachment purposes"), *cert. denied*, 319 Md. 484, 573 A.2d 808 (1990). Moreover, appellant's convictions occurred in 1998, well within the fifteen-year limit established by Rule 5–609. Although appellant's prior theft conviction is similar to the crimes charged in this case, the similarity is "only one consideration in [our] balancing process." *Facon, supra*, 144 Md.App. at 47, 796 A.2d 101. Furthermore, appellant's prior robbery conviction is not similar to the charges of which he was convicted here. Given that appellant testified that a "voice" authorized him to take Huffman's Hummer, his credibility was central to his defense. Because four of the five factors enunciated in *Facon* weighed in favor of the admissibility of appellant's prior robbery conviction, and three factors weighed in favor of the admissibility of appellant's prior theft conviction, the court did not abuse its discretion in allowing the State to impeach appellant with the convictions.

---

**6.** Del Code Ann. tit. 11, § 831(a) (2009) states, in part:

A person is guilty of robbery in the second degree when, in the course of committing theft, the person uses or threatens the immediate use of force upon another person with intent to:

(1) Prevent or overcome resistance to the taking of the property or to the retention thereof immediately after the taking; or

(2) Compel the owner of the property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft.

Del Code Ann. tit. 11, § 841(a) (2007) states, in part: "A person is guilty of theft when the person takes, exercises control over or obtains property of another person intending to deprive that person of it or appropriate it."

## III.

Next, appellant complains that the court erred in failing to instruct the jury on mistake of fact. We turn to review facts pertinent to this issue.

At the close of evidence, defense counsel asked the court to propound the following jury instruction:

> You have heard evidence that [appellant's] actions were based on a mistake of fact. Mistake of fact is a defense and you are required to find [appellant] not guilty if all [of] the following three factors are present: one, [appellant] actually believed he was God; two, [appellant's] belief and actions were reasonable under the circumstances; three, [appellant] did not intend to commit the crime of attempted theft or attempted taking of a motor vehicle and [appellant's] conduct would not have amounted to these crimes if the mistaken belief had been correct, meaning if the true facts were what [appellant] thought them to be, [appellant's] conduct would not have been criminal. In order to convict [appellant,] the State must show that the mistake of fact defense does not apply in this case by proving beyond a reasonable doubt that at least one of the three factors previously stated was absent.

The court declined to give the instruction. After appellant "except[ed] to the Court's refusal," the court responded: "I don't see any applicability of that instruction to this particular case. So your exception is noted. It's denied."

According to appellant, "the proposed instruction . . . was clearly a correct statement of the law[,] clearly generated by the testimony[,] and . . . not fairly covered by any instruction actually given." Therefore, he contends: "It was . . . error for the . . . court not to instruct the jury on mistake of fact." The State concedes that appellant's requested instruction correctly stated the applicable law and was not fairly covered in the court's other instructions. But, it maintains that appellant's "alleged mistake would not be a defense to the . . . crimes charged," and therefore the "mistake of fact [instruction] was not generated[.]"

`In *General v. State,* 367 Md. 475, 789 A.2d 102 (2002), the Court of Appeals reviewed the defense of "mistake of fact." It said:

> As a general rule, mistake of fact is a recognized common law defense to certain crimes. Mistake or ignorance of fact exists when the actor does not know what the actual facts are or believes them to be other than as they are. In essence, a mistake of fact is a defense when it negates the existence of the mental state essential to the crime charged.
>
> \* \* \*
>
> Whether a[n] instruction [on mistake of fact] must be given depends upon whether there is any evidence in the case that supports the instruction; if the requested instruction has not been generated by the evidence, the trial court is not required to give it. Whether the evidence is sufficient to generate the requested instruction in the first instance is a question of law for the judge. In evaluating whether competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused.

*Id.* at 483–84, 486–87, 789 A.2d 102 (citations and footnotes omitted).

Here, appellant contends that the court was required to give a mistake of fact instruction because, at the time of the events that led to the charges in this case, he mistakenly believed that he was God. This belief, however, did not negate the willfulness of his actions or his intent to deprive Huffman of the Hummer. *See* Md.Code (2002, 2009 Supp.), §§ 7–104(a) and 7–105(b) of the Criminal Law Article ("C.L.").[7] In fact, appellant testified that, knowing that he did not own the

---

7. C.L. § 7–104(a) states: "A person may not willfully or knowingly obtain or exert unauthorized control over property, if the person ... intends to deprive the owner of the property[.]" C.L. § 7–105(b) states: "A person may not knowingly and willfully take a motor vehicle out of the owner's lawful custody, control, or use without the owner's consent."

Hummer, he willfully and knowingly entered it with the intent to "get" it from Huffman and her family.

Because appellant acted willfully and knowingly, his mistaken belief that he was God was not a defense to the crimes of which he was charged, and was insufficient to generate his requested mistake of fact instruction. The court did not err in declining to give the instruction.

## IV.

■ Appellant contends that, because "no evidence was presented that established that [he] was attempting to willfully or knowingly remove the Hummer from the possession of ... Huffman [with] the intention to ... deprive ... Huffman of" it, *see* C.L. §§ 7–104(a) and 7–105(b), *supra,* the evidence was insufficient to sustain his convictions. The State counters that "the evidence presented was more than sufficient" to sustain the convictions.

■ The standard for appellate review of evidentiary sufficiency in a criminal case is well settled. We must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). In *State v. Smith,* 374 Md. 527, 533–34, 823 A.2d 664 (2003), the Court explained:

> "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323, 331 (1998).... "We give 'due regard to the [fact finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.'" *Moye [v. State],* 369 Md. [2,] 12, 796 A.2d [821,] 827 [ ( 2002) ] (quoting *McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675, 685 (1997) (quoting *[State v.] Albrecht,* 336 Md. [475,] 478, 649 A.2d [336,] 337 [ (1994) ] )[, *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) ] ). We do not re-weigh the evidence, but "we do determine whether the verdict was supported by sufficient

evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *White [v. State]*, 363 Md. [150,] 162, 767 A.2d [855,] 862 [ (2001) ].

*See also Bible v. State,* 411 Md. 138, 982 A.2d 348 (2009).

Here, Huffman discovered appellant sitting in the driver's seat of her Hummer with "his hands . . . in the floorboard area." After appellant exited the Hummer, Huffman saw "wiring hanging" from underneath its dashboard. Appellant told Huffman that he "needed to take the truck" and that "he wasn't going to leave without" it. Appellant later told Trooper Hagel that, after "a voice . . . told him . . . to take the Hummer[,]" appellant attempted to comply. At trial, appellant testified that, after his own truck experienced mechanical problems, a "voice" told him that the Hummer, which appellant knew he did not own, was his. After admiring the Hummer, appellant decided to "get" it.

Viewing the evidence in the light most favorable to the prosecution, as we must, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant willfully and knowingly attempted to obtain control over the Hummer with the intent to deprive Huffman of it.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**